1  **RAHILA KHAN**
2  **40224 Blanchen Street**
   **Fremont, CA 94538**
3  **Tel: (510) 999-7991**
   **Fax: (510) 999-7991**
4
   **Plaintiffs In Pro Per**
5

FILED

MAR - 6 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

6              **UNITED STATES DISTRICT COURT**

7              **NORTHERN DISTRICT OF CALIFORNIA**

8                 **UNLIMITED CIVIL CASE**

9  **RAHILA KHAN,**                    )    Case No: **12-01107**
                                        )
10        **Plaintiff,**               )    **PLAINTIFFS COMPLAINT FOR**
                                        )
11  **vs.**                            )    **(1) FRAUD;**
                                        )    **(2) VIOLATIONS OF TRUTH IN**
12                                      )    **LENDING ACT;**
    **RECONTRUST COMPANY and**          )    **(3) VIOLATIONS IN REAL ESTATE**
13  **BANK OF AMERICA, N.A., and**      )    **SETTLEMENT PROCEDURES ACT;**
    **DOES 1 through 10**               )    **(4) VIOLATIONS OF CALIFORNIA**
14                                      )    **CIVIL CODE SECTIONS 2923.5 and**
                                        )    **2924**
15        **Defendants.**              )
                                        )
16                                      )
                                        )
17                                      )    **Date:** _____
                                        )    **Time:** _____
18                                      )    **Place:** _____
                                        )    **Trial Date:** _____
19  _____)

20  Plaintiff Rahila Khan (hereinafter referred to as "Plaintiff') alleges as follows:

21        l.      At all times material to this Complaint, plaintiff was and is a resident of the City

22  of Fremont in Alameda County, California. At all times material to this Complaint, the plaintiff

23  was the owner of the "Subject Property" as set described and incorporated by reference. To

24  finance the purchase of the Subject Property, the plaintiff obtained two loans -- the 1st Loan

25  consisting of the 1st promissory note and 1st deed of trust, described and incorporated by

reference, and the 2nd Loan consisting of the 2nd promissory note and the 2nd deed of trust, described and incorporated by reference,

2.      Defendant Bank of America Corporation (hereinafter "Bank of America Corp.") is a foreign corporation bank incorporated in Delaware with its principal place of business in Charlotte, North Carolina. At all times material to this Complaint, Bank of America Corp. was doing business in the State of California. Bank of America Corp. is the parent corporation of Bank of America, N.A. and is a successor in interest by merger to Countrywide Financial. At all times material to this Complaint, defendant Bank of America Corp. was and is doing business in the State of California as the following named corporations and entities: Bank of America, N.A., BAC Homes Loans Servicing L.P., Countrywide Financial Corporation, Countrywide Homes Loans, Inc. and Countrywide Homes Loans Servicing, LP and ReconTrust Company, NA.

3.      Bank of America Corp. which was doing business as said corporations and entities in California identified and incorporated by reference, has assumed the liabilities of these corporations and entities, according to the rule of successor liability in that when Bank of America Corp. acquired by transactions involving purchase, transfer or otherwise the assets of said corporations and entities, there was an express or implied agreement of assumption of their liabilities by Bank of America Corp. and said transactions amounted to a consolidation or merger of Bank of America Corp. and said corporations and entities. Therefore, Bank of America Corp. and said corporations and entities are one and the same, based upon the following facts:

A.      Bank of America, N.A. is a national bank with is principal place of business located in Charlotte, North Carolina. At all times material to this Complaint, Bank of America, N.A. was doing business in the State of California. Bank of America, N.A. is the parent corporation by merger of BAC Homes Loans Servicing, LP.

B.      BAC Homes Loans Servicing, LP (hereinafter "BAC") is a subsidiary of Bank of America, N.A. with its principal place of business in Texas. On July 1, 2011, BAC was merged

1   into Bank of America, NA. At all times material to this Complaint, BAC was doing business in
2   the State of California. As all times material to this Complaint, since approximately September
3   2009 as set forth and incorporated by reference, BAC became the servicer of the plaintiffs two
4   Loans regarding the Subject Property and serviced and is now servicing said Loans.

5         C.      Countrywide Financial Corporation (hereinafter "Countrywide") is a Delaware
6   corporation and a thrift holding company which did business in California. Countrywide Home
7   Loans, Inc. was a New York Corporation licensed to do business in California and was a wholly
8   owned subsidiary of Countrywide Financial, which was a licensed mortgage banking
9   organization. At all times material to this Complaint, Countrywide Home Loans Servicing, LP is
10   or was a Texas limited partnership directly owned by Countrywide GP, Inc. and Countrywide
11   LP, Inc., each a Nevada corporation, and was a direct wholly owned subsidiary of Countrywide
12   Home Loans, Inc. Countrywide Servicing serviced loans originated by Countrywide.
13   Countrywide serviced the plaintiffs two Loans which financed the purchase of the Subject
14   Property, as set forth and incorporated by reference.

15         D.      On July 1, 2008, Bank of America Corp. completed its purchase of Countrywide
16   in an all-stock transaction that Bank of America Corp. has described as a merger. Since
17   Countrywide's acquisition, Bank of America Corp. has taken over servicing loans previously
18   serviced by Countrywide along with its own servicing portfolio. The combined mortgage lending
19   operation Bank of America Corp. and Countrywide now operate under the name Bank of
20   America Home Loans. The servicing operations of Bank of America Home Loans and
21   Countrywide were merged into BAC. As part of the merger, Bank of America Corp. assumed
22   Countrywide's liabilities.  Countrywide has been completely integrated into Bank of America
23   and has virtually ceased to exist.  In November 2008, Countrywide's assets were transferred to
24   Bank of America Corp. Countrywide has stopped independently filing financial statements.
25   Instead, Countrywide's assets and liabilities are reported on Bank of America Corp.'s financial

statements. On April 27, 2009, Bank of America Corp. announced in its press release of that date, that the Countrywide brand has been retired.

E.      At all times material to this Complaint, after approximately November 2006, as set forth and incorporated by reference, Countrywide Home Loans, Inc. acted as the servicer (hereinafter "Servicer") of the 1st Loan and 2nd Loan regarding the Subject Property pursuant to the Pooling and Servicing Agreement dated March 1, 2007 (hereinafter the "PSA") filed with the Securities and Exchange Commission (hereinafter "SEC") as set forth and incorporated by reference. Said PSA formed the Morgan Stanley Trust Home Equity Loan Trust 2007-2, Mortgage Pass Through Certificates, Series 2007-2. The plaintiff is informed and believes that sometime after Bank of America Corp. acquired Countrywide, BAC a subsidiary of Bank of America Corp. took over the role of Servicer of the plaintiff's 1st Loan and 2nd Loan pursuant to the terms of said PSA, which allows for the appointment of successor Servicers and sub-Servicers. Therefore, at all times material to this Complaint, after approximately September 2009, as set forth and incorporated by reference, Bank of America Corp. and BAC were and are the Servicer(s) of said 1st Loan and 2nd Loan. Therefore, Bank of America Corp. and BAC are one and the same and Bank of America Corp. is liable for any and all of BAC's, LP's conduct alleged herein. In addition, thus, Bank of America and Countrywide are one and the same and Bank of America Corp. is liable for any and all of Countrywide's conduct alleged herein.

4.      Defendant ReconTrust Company, N.A. (hereinafter "ReconTrust") is a wholly-owned subsidiary of Bank of America N.A. ReconTrust is a for-profit business entity permitted by the U.S. Office of the Comptroller of the Currency to exist as a non-depository uninsured, limited—purpose national trust bank. ReconTrust and BAC Loan Servicing, L.P., are part of the same company, in that they are both subsidiaries of Bank of America Corp. At all times material to this Complaint, ReconTrust was doing business in the State of California. ReconTrust is in the business of foreclosing loans serviced by Bank of America, N.A. and its wholly owned

subsidiary, BAC.  Recontrust, on its website at http://www.recontrustc0.com/index.aspx states as of the date of the filing of this complaint that it is doing business as follows: "ReconTrust's default management services could take the weight off your operations, so you can focus on your core business. We provide foreclosure services in 16 states." ReconTrust's website does not state it does any other type of business. At all times material to this Complaint, ReconTrust acted as a Servicer of the plaintiff's 1st Loan and 2nd Loan regarding the Subject Property and/or as a trustee or defacto trustee pursuant to California Civil Code §2934a. Furthermore, apparently sometime after the Assignment of Deed of Trust on June 28, 2011, as set forth and incorporated by reference, ReconTrust took over a role of Servicer of the plaintiffs 1st Loan and 2nd Loan from BAC, pursuant to the terms of said PSA which allows for the appointment of successor Servicers and sub-Servicers.

5.     Plaintiffs are ignorant of the true names and capacity of the Defendants sued herein as DOES 1 through 10 and, therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

6.     Defendants sued herein as DOES 1 through 10 are contractually, strictly, negligently, intentionally, vicariously liable and or otherwise legally responsible in some manner for each and every act, omission, obligation, event or happening set forth in this Complaint, and that each of said fictitiously named Defendants is indebted to Plaintiff as hereinafter alleged.

7.     The use of the term "Defendants" in any of the allegations in this Complaint, unless specifically otherwise set forth, is intended to include and charge both jointly and severely, not only named Defendants, but all Defendants designated as well.

8.     Plaintiff is informed and believe and thereon alleges that, at all times mentioned herein, Defendants were agents, servants, employees, alter egos, superiors, successors in interest, joint venturers and/ or co-conspirators of each of their co-defendants and in doing the things herein after mentioned, or acting within the course and scope of their authority of such agents,

servants, employees, alter egos, superiors, successors in interest, joint venturers and/ or co-conspirators with the permission and consent of their co-defendants and, consequently, each Defendant named herein, and those Defendants named herein as DOES 1 through 10, inclusive, are jointly and severely liable to Plaintiff for the damages and harm sustained as a result of their wrongful conduct.

9.      Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiff, as alleged herein.  In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

10.     Defendants, and each of them, knowingly and willfully conspired, engaged in a common enterprise, and engaged in a common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise, and common course of conduct complained of was, inter alia, to financially benefit Defendants at the expense of Plaintiffs by engaging in fraudulent activities.  Defendants accomplished their conspiracy, common enterprise, and common course of conduct by misrepresenting and concealing material information regarding the servicing of loans, and by taking steps and making statements in furtherance of their wrongdoing as specified herein.  Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of herein, and was aware of its overall contribution to and furtherance thereof.  Defendants' wrongful acts include, inter alia, all of the acts that each of them are alleged to have committed in furtherance of the wrongful conduct of complained of herein.

11.     Any applicable statutes of limitations have been tolled by the Defendants'

continuing, knowing, and active concealment of the facts alleged herein.  Despite exercising

reasonable diligence, Plaintiff could not have discovered, did not discover, and was prevented

from discovering, the wrongdoing complained of herein.

12.     In the alternative, Defendants should be estopped from relying on any statutes of

limitations.  Defendants have been under a continuing duty to disclose the true character, nature,

and quality of their financial services and debt collection practices.  Defendants owed Plaintiffs

an affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such

duty.

## INTRODUCTION

13.     This action arises out of the worst economic crisis since the Great Depression.

The implosion of the real estate market is at the center of the crisis.  It has created a frenzy

among banks such as Bank of America, one of the largest corporation in terms of assets in the

world, to foreclose on as many properties as possible.  It has recently come to light that, in their

quest to foreclose on properties as quickly as possible, Bank of America and other lenders have

been acting outside of the law in its foreclosure practice.

14.     Ever since, the national press has been reporting stories of numerous illegalities in

the policies, practices and procedures of lenders, and their employees and agents employed and

retained to process foreclosures.  The evidence is overwhelming that Bank of America and other

lenders have been acting outside of the law since this crisis began.  This action is a prime

example of Bank of America and its agents' wrongful and illegal conduct in their greed for

property and fees at any cost without any regard to the rights of homeowners and borrowers.

## STATEMENT OF FACTS

## 15.   THE PLAINTIFF EMPLOYED GOLDEN STATE AND DOES 1 THROUGH 10 TO PROCURE A LOAN FOR HER TO PURCHASE THE "SUBJECT PROPERTY".

On or about September 2006, Plaintiff engaged the services of Golden State and the entities to which it "converted out" (hereinafter "DOES 6 through 10") by engaging the services of a male mortgage broker Thomas, whose last name the plaintiff cannot now recall (hereinafter DOE 1) and a female employee of Golden State named Mary, whose last name the plaintiff cannot now recall (hereinafter DOE 2) and a male supervisor whose name the plaintiff cannot now recall (hereinafter DOE 3) and possibly engaged the services of other persons employed by Golden State and Does 6 through 10, whose identities the plaintiff does not recall or know at this time, (hereinafter DOES 4 through 5).  Mary, DOE 2, acted at all times material to this Complaint, in the role of an assistant to DOE 1 AND DOE 3. DOES 1 through 5 held themselves out to be agents and employees of Golden State and plaintiff is informed and believes and thereon alleges that they worked for Golden State. Plaintiff employed the services of said defendants Golden State DOES 1 through 10 to procure a loan for her to purchase the Subject Property. The plaintiff's primary language is Urdu. The plaintiff at the time she procured said 1st Loan and 2nd Loan had limited English language ability regarding reading, and could not read and understand the terms used in reference to loans and financing. The plaintiff could not read the and understand the terms in English regarding said 1st Loan and 2nd Loan as set forth in the stack of loan documents which Does 1 through 3 told her to sign in order to procure said loans. The plaintiff told Does 1 through 3 that her primary language was Urdu and that she could not read said loan documents, but they failed to provide for her any translation whatsoever. Instead, Doe 3 made representations about the 1st Loan and 2nd Loan to the plaintiff as set forth and

incorporated by reference and told her that said loan documents stated what he represented to her as set forth in said paragraphs. The plaintiff believed Doe 3 and relied upon him completely.

A. On the day the plaintiff signed the loan documents at Golden State's office in Fremont, California, the plaintiff could not read the loan documents which contained sophisticated and complex loan and finance terms because of her limited English language reading ability and needed to have all of the loan documents translated into Urdu for her so she could understand them. However, DOE 3, speaking English, represented to the plaintiff what was in the loan documents and she believed what he said to her because of his apparent professional expertise.

B. On the day the plaintiff signed the loan documents at Golden State's office in Fremont, DOES 1 through 3 did not translate into Urdu any of what Doe 3 represented to the plaintiff in his oral statements regarding the two loans, nor did they translate into Urdu any of the documents regarding the 1st Loan and 2nd Loan which she signed.

## 16.   VICARIOUS LIABILITY - DOES 1 THROUGH 5 WERE AGENTS AND EMPLOYEES OF GOLDEN STATE

At various times, DOE 1 and DOE 3 represented to the plaintiff that each one of them, individually, was a mortgage broker who worked on behalf of Golden State and as its employee and that everything each one of them did for her regarding obtaining the loan and everything each one of them said to her regarding the loan, was on behalf of Golden State and DOES 6 through 10. DOE 1 and DOE 3 told the plaintiff that Golden State employed each of them as a mortgage broker to work on behalf of Accredited to provide a loan to the plaintiff regarding the Subject Property. The plaintiff alleges that defendants Golden State and Does 6 through 10, are responsible for the conduct of DOES 1 through 5 because said DOES 1 through 5 were the apparent employees and agents of said defendants in that Golden State and Does 6 through 10 intentionally and/or carelessly created the impression that DOES 1 through 5 were their agents and employees.  Furthermore, the plaintiff reasonably believed that DOES 1 through 5 were the agents and employees of Golden State and DOES 6 through 10. The plaintiff was harmed as set forth in this Complaint incorporated by reference because she reasonably relied on said belief. At

1    all times material to this Complaint, the plaintiff alleges that DOES 1 through 5 acted within the

2    course and scope of their employment with Golden State and DOES 6 through 10.

3    **17.    VICARIOUS LIABILITY - GOLDEN STATE AND DOES 1 THROUGH 10**

4    **WERE AGENTS OF ACCREDITED**

5          On the day that the plaintiff signed the loan documents at Golden State's office in

6    Fremont, CA, DOE 1 and DOE 3 represented to the plaintiff the each of them and

7    Golden State were mortgage brokers who also worked on behalf of Accredited, and that

8    everything each of them did for her regarding obtaining the loan and everything he said to her

9    regarding the loan, was also on behalf of Accredited. DOE 1 and DOE 3 each said to the

10    plaintiff, words to the effect: "I speak for Accredited." Furthermore, DOE 1 and DOE 3 each

11    said that Accredited employed each of them and Golden State as mortgage brokers to work on

12    behalf of Accredited to provide a loan to the plaintiff regarding the Subject Property. The

13    plaintiff alleges that defendant Accredited is responsible for the conduct of defendants Golden

14    State and DOES 1 through 10 because said defendants were the apparent employees and agents

15    of said defendant Accredited in that they intentionally and/or carelessly created the impression

16    that they were Accredited agents and employees. Furthermore, the plaintiff reasonably and

17    justifiably believed that Golden State and Does 1 through 10 were the agents and employees of

18    Accredited. The plaintiff was harmed as set forth in this Complaint because she reasonably relied

19    on her belief. At all times material to this Complaint, the plaintiff alleges that that Golden State

20    and Does 1 through 10 acted within the course and scope of their agency and employment with

21    Accredited. Furthermore, the plaintiff alleges that defendants Golden State and Does 1 through

22    10 were the agents and employees of Accredited, therefore Accredited is responsible for their

23    conduct. Said defendants were Accredited's agents and employees, because Accredited gave

24    them the authority to act on its behalf. The plaintiff is informed and believes and thereon alleges

25    that said authority was given by words of Accredited's managing agents who underwrote the

loan and who required proof of income from the plaintiff thus employing the agents DOES 1

through 5 to that end, Said authority was also implied by the parties' conduct, as set forth below:

A. Accredited provided out of the loan proceeds to defendants Golden State and Does 1
through 10, a Loan Origination Fee of $4,000.00, and a Processing fee of $995.00 and the
"Yield Spread" to Golden State was "$5,175.00 POC". Said Yield Point Spread was
provided to said defendants in exchange for their convincing the plaintiff to obtain a the
1st and 2nd loans which had higher interest rates and prepayment penalties, than normal
loans. Thereby, Accredited provided Golden State and Does 1 through 10 with an
monetary incentive to act in ways that furthered the lender's interests and profits at the
expense of the plaintiff. Thereby, Accredited's conduct showed it authorized Golden
State and Does 1 through 10 to act as its agents at all times material to this Complaint.

B. Accredited was in the business of underwriting the 1st Loan which was a predatory
loan as set forth in paragraph 32 incorporated by reference, because it was a negative
amortization loan, The 1st Loan and 2nd Loan were unconscionable loans in that they
were made based on the foreclosure value of the collateral, rather than on a determination
that the borrower had the capacity to make the scheduled payments under the terms of the
loan, based on the borrower's current and expected income, current obligations,
employment status, and other relevant financial resources.

C. Accredited knew that it gave instructions to the title company Alliance's closing agent
in its "Addendum to Lender's Instructions" that the title company was to obtain various
proofs of the plaintiffs' capacity to make scheduled payments under the terms of the loan,
when in fact, such proof was inadequate proof, as set forth in paragraph 33. B. Thus,
Accredited knew, based upon its knowledge of what documents the title company
procured from the plaintiff pursuant to the Addendum, as set forth in paragraph 33 A
incorporated by reference, that the plaintiff did not provide all the proof required in said
Addendum at the time she signed the loan papers. Therefore, Accredited knew that
defendants Golden State and Does 1 through 10 also did not obtain said documentation.
Therefore Accredited gave said defendants the authority to have the plaintiff sign the loan
documents without providing sufficient proof of her income. Accredited and Golden
State and Does 1 through 10 worked together to have the plaintiff obtain a predatory and
unconscionable 1st Loan and 2nd Loan. Thereby, Accredited's conduct showed it
authorized Golden State and Does 1 through 10 to act as its agents at all times material to
this Complaint.

D. As set forth in sections A through C above, Accredited had the right to control and
supervise and did supervise and control the means by which the 1st Loan and 2nd Loan
were obtained by the plaintiff, because Accredited used the title company and its agents
Golden State and DOES 1 through 10 to obtain proof of income and then, in fact,
provided the loan without said proof. This established the agency relationship between
Accredited and Golden State and Does 1 through 10. As set forth in A through C above,
Accredited gave Golden state and Does 1 through 10, the authority to represent and bind

the lender on its behalf regarding the plaintiffs proof of income required to obtain the loan, because Accredited knew that said proof of income was insufficient. Thus Accredited acted in such a way that it would give at third party the impression that said agency relationship existed.

**18.     VICARIOUS LIABILTY - ACCREDITED AIDED AND ABETTED GOLDEN STATE AND DOES 1 THROUGH 10 IN HARMING THE PLAINTIFF.**

The plaintiff alleges that she was harmed as set forth in this Complaint by Golden State and Does 1 through 10 and that Accredited is responsible for said harm because Accredited, through its managing agents, aided and abetted Golden State and Does 1 through 10 as set forth hereinabove, incorporated by reference which alleges facts that Accredited knew that Golden State and Does 1 through 10 were going to commit and had committed the harm of having the plaintiff contract for a predatory loan, in that she had insufficient proof of income. As set forth herein, Accredited gave substantial assistance and encouragement to Golden State and Does 1 through 10 in committing said harm, and Accredited's conduct was a substantial factor in causing harm to the plaintiff.

**19.     VICARIOUS LIABILTY — ACCREDITED ENGAGED IN A CONSPIRACY WITH GOLDEN STATE AND DOES 1 THROUGH 10 IN ORDER TO HARM THE PLAITNIFF.**

The plaintiff alleges that she was harmed by Golden State and Doe 1 through 10 as set forth in this Complaint and that Accredited is responsible for said harm because Accredited was part of the conspiracy to commit with Golden State and DOES 1 through 10 the wrongful acts of Misrepresentation, Fraud and Deceit as set forth herein and incorporated by reference and Negligent Misrepresentation as set forth in paragraphs 73 Through 82 incorporated by reference and to engage in providing to the plaintiff a predatory and unconscionable 1st Loan and 2nd Loan as set forth herein and for the wrongful act of engaging in a contract which was an Unconscionable Loan as set forth herein and incorporated by reference.  Accredited made an agreement with Golden State and Does 1 through 10, orally and in writing and as implied by the

conduct of the parties, as set forth hereinabove, incorporated by reference, that Accredited untended that said wrongful acts would be committed for its own profit and that of Golden State and Does 1 through 10. Accredited knew because of the plaintiff's failure to provide sufficient proof of income as required by Accredited's escrow instructions, that Golden State and Does 1 through 10 planned to commit said wrongful acts, and Accredited cooperated with Golden State and Does 1 through 10 in committing said wrongful acts. Therefore, because Accredited engaged in said conspiracy with Golden State and Does 1 through 10, it is responsible and liable for their wrongful acts and all the acts done by Golden State and DOES 1 through 10 in furtherance of their common plan, and for all the harm and damages caused to the plaintiff from said wrongful acts.

**20. VICARIOUS LIABILTY — ACCREDITED ENGAGED IN A JOINT VENTURE WITH] GOLDEN STATE AND DOES 1 THROUGH 10 IN ORDER TO HARM THE PLAINTIFF.**

Plaintiff alleges that Accredited, through its managing agents engaged in a joint venture with Golden State and Does l through l0, therefore Accredited is responsible and liable for the conduct of Golden State and Does l through 10 and for all their actions in furtherance of said joint venture. Said joint venture was created by oral and written agreements and implied by the conduct of the parties, as set forth in hereinabove, incorporated by reference which alleges facts that Accredited and Golden State and DOES 1 through 10, combined their skills, knowledge and property with the intent to carry out a single business undertaking of providing a predatory 1st Loan and 2nd Loan to the plaintiff, and each had an ownership interest in said business undertaking. In addition, Accredited and Golden State and DOES 1 through 10 had joint control over the business undertaking even though they agreed to delegate said control among each other. In addition, Accredited and Golden State and DOES 1 through 10 agreed to share the profits of said business and the losses of said business and had an understanding as to the sharing

1  of profits and losses. Therefore, Accredited is responsible and liable to the plaintiff for the

2  wrongful conduct of Golden State and Does 1 through 10, in furtherance of said business

3  enterprise and the damage caused to her by said wrongful conduct.

4      **21.**    **VICARIOUS LIABILITY -- ACCREDITED AND BANK OF AMERICA**

5  **CORP. RECONTRUST AND DEUTSCHE, AS THE TRUSTEE FOR THE MORGAN**

6  **STANLEY TRUST AND THE MORGAN STANLEY TRUST ARE JOINT VENTURERS.**

7      The plaintiff alleges that the terms of the PSA, as set forth herein and incorporated by

8  reference, constitute evidence of the creation and existence of a joint venture between: 1) the

9  seller of the mortgage loans — Accredited and 2) the Servicer of the loans at that time -

10  Countrywide, and its successor Servicers and sub-Servicers, namely Bank of America Corp.

11  doing business as BAC and doing business as ReconTrust, and 3) the trustee Deutsche,

12  individually and as trustee of the Morgan Stanley Trust and 4) the Morgan Stanley Trust.

13  Pursuant to the PSA, said defendants had an agreement to pool and service mortgages between

14  Accredited, as seller, Countrywide, as Servicer, and its successor Servicer, Bank of America

15  Corp. and its sub-servicer's BAC and ReconTrust, and Deutsche as the trustee, and the Morgan

16  Stanley Trust. Accredited provided the mortgage loans, Countrywide and its successors provided

17  servicing of the loans and the Morgan Stanley Trust provided the financing or money. Finally,

18  pursuant to the PSA, there was an agreement on the fees each party could collect as well as their

19  liability for losses. Moreover, the Morgan Stanley Trust's revenue resulted primarily

20  from the sale of mortgage loans through securitization on purchased pools of home loans.

21  Therefore, said defendants engaged in a joint venture and each of them is responsible and liable

22  for each other's conduct in acting in furtherance of said joint venture. Said defendants thereby

23  combined their skills, knowledge and property with the intent to carry out a single business

24  undertaking and each had an ownership interest in said business undertaking. Said defendants

25  had joint control over said business undertaking even though they agreed to delegate said control

among each other. In addition, said defendants had an understanding as to the sharing of profits and losses. Therefore, said defendants are responsible and liable for each other's wrongful conduct toward the plaintiff in furtherance of said business enterprise and for the damage caused to her by said wrongful conduct.

22. **VICARIOUS LIABILITY - BECAUSE ACCREDITED AND BANK OF AMERICA CORP., RECONTRUST, AND DEUTSCHE, INDIVIDUALLY AND AS THE TRUSTEE FOR THE MORGAN STANLEY TRUST AND THE MORGAN STANLEY TRUST ARE E VENTURERS, THEY ARE VICARIOUSLY LIABLE FOR EACH OTHER'S CONDUCT. BECAUSE THEY ARE VICARIOUSLY LIABLE FOR ACCREDITED'S CONDUCT, THEY ARE ALSO LIABLE FOR THE CONDUCT GOLDEN STATE AND DOES 1 THROUGH 1O WHICH ARE ACCREDITED'S AGENTS, CO-CONSPIRATORS, CO-JOINT VENTURERS AND THOSE WHICH ACCREDITED AIDED AND ABETTED.**

The plaintiff incorporates by reference paragraph 1 through 22. Because each joint venture is liable for the acts of its co-joint venturers, Bank of America Corp., ReconTrust, Deutsche, and the Morgan Stanley Trust are liable for the wrongful acts of Accredited and the damage caused thereby to the plaintiff. Because Golden State and DOES 1 through 10, was at all times material to this Complaint, the agents, co-conspirators and co-joint venturers of Accredited and were aided and abetted by Accredited in committing wrongful acts and damages, said joint venturers are also vicariously liable for Golden State and DOES 1 through 10's wrongful acts and for the damages they caused the plaintiff as alleged in this Complaint.

23. **GOLDEN STATE'S AND DOES 1 THROUGH 10'S REPRESENATIONS AND ACCREDITED'S REPRESENTATIONS TO THE PLAINTIFF REGARDING OBTAINING A LOAN TO FINACNE THE PURCHASE OF THE SUBJECT PROPERTY.**

1    On or about September 5, 2006, the plaintiff went to Golden State's office in Fremont,

2    CA and signed a stack of loan documents provided to her by DOES 1 through 3 in order to

3    procure the 1st Loan and the 2nd. That she would not have to make any down payment to

4    purchase the property because the loan would cover the down payment of about $115,000.00.

5    **24.    GOLDEN STATE'S AND DOES 1 THROUGH 10'S KNOWLEDGE AND**

6    **ACCREDITED'S KNOWLEGE REGARDING THE PLAINTIFF'S FINANCIAL**

7    **CONDITION AND HER OWNER-OCCUPYER STATUS AT THE TIME THEY**

8    **PROCURED THE ACCREDITED LOAN**

9    The plaintiff alleges that Golden State and DOES 1 through 10 knew and Accredited

10   knew through its agents Golden State and DOES 1 through 10 at the time DOE 1 and DOE 3

11   were negotiating for the loan and procuring the loan from Accredited for the plaintiff that:

12   A. In June 2006, through the services of Golden State and DOE 1 the plaintiff procured a
13   1st Loan and a 2nd Loan for her to purchase the property known as 40224 Blanchard
     Street, Fremont, CA (hereinafter "Blanchard Street" ). The 1s' loan on Blanchard Street in
14   the amount of $548.000.00 required her to make monthly payments of $3,212.10 to
     Countrywide and that the 2" Loan on Blanchard Street in the amount of $137,000.00
15   required her to make monthly payments of $1,255.66 to GMAC company. Furthermore,
     said defendants knew that the plaintiff, at the time Golden State was negotiating and did
16   procure the Accredited loans, that the plaintiff was in debt for the two loans on Blanchard
     Street in the total amount of $685,000.00 and was paying total monthly payments of
17   $4,467.66 for said two loans on Blanchard Street. Furthermore, the plaintiff is informed
     and believes now, although she did not know at the time she procured said loans, that the
18   1st loan on Blanchard Street was an adjustable predatory "pick and pay" interest rate loan
     in that the interest rate would go up over time and principal would not be paid down over
19   time, and that both the 1st and 2nd loans on Blanchard Street had prepayment penalties.

20   B. That the plaintiff was, in fact, at that time she signed documents for the 1st Loan and
21   2nd Loan, the owner-occupier of Blanchard Street and had been a California licensed day
     care provider only since June 2006 and that her monthly gross income at the time Golden
22   State was negotiating and did procure the Accredited loans, was $2,000 per month. The
     plaintiff did not have a college degree or professional license other than a day care
23   license at that time. Golden State, Accredited and Does 1 through 10 knew these facts
     because the plaintiff told DOE 1 and DOE 3 these facts.

24   C. That the plaintiff was not a partner in her husband's business — AR Imaging -- and
25   had no other income other than from her day care business which she operated at

Blanchard Street. Golden State, Accredited and Does 1 through 10 knew these facts because the plaintiff told DOE 1 and DOE 3 these facts

D. That Golden State and DOES 1 to 10 and Accredited, knew that the plaintiffs husband was not going to be responsible for the payment of any loans to finance the plaintiff'' s purchase of the Subject Property. Furthermore, said defendants knew that the 3 bank statements which the plaintiff brought to with her when she signed the loan documents were in fact statements regarding her joint bank account with her husband. Said three statements showed a balance of approximately $10,000 per month during June, July and August 2006. The sum of $10,000 on each statement, included each month approximately $2,000.00 which was the plaintiff' s monthly income from her business and approximately $1,000.00 which was her husband's monthly income and approximately $7,000.00 which was the plaintiffs and her husband's savings over time. Other than some furniture and household and personal items of limited value, Golden State knew that the plaintiffs total assets at the time it procured the Accredited loans were only evidenced by said cash amount of approximately $7,000.00 in said joint bank account. Golden State, Accredited and Does 1 through 10 knew these facts because the plaintiff brought these bank statements with her and her child care license and showed them to DOE 1 and DOE 3 at the time she signed the loan documents. Despite the facts alleged in this paragraph 29, Accredited contracted with the plaintiff to provide her with the 1st Loan and 2nd Loan to finance the purchase of the Subject Property.

25.   **GOLDEN STATE'S AND DOES 1 THROUGH 10'S AND ACCREDITED'S REPRESENTATIONS TO THE PLAINTIFF AT THE TIME SHE SIGNED THE 1st NOTE AND 2nd NOTE AND OTHER DOCUMENTATION TO OBTAIN THE ACCREDITED LOANS**

The plaintiff alleges that DOE 1 told the plaintiff THAT she was to sign documents to procure a loan to finance the Subject Property at Golden State's office in Fremont California sometime prior to September 5, 2006. When the plaintiff arrived at Golden State's Office, the plaintiff believed, as represented to her by Doe I that Accredited would provide her one loan for 30 years at the fixed interest rate of approximately 6.00% and that she would not be charged more money if she paid the loan off early. Instead, when she arrived at Golden State's office in Fremont to sign the loan documents, DOE 3, the supervisor took over and told the plaintiff he was in charge, and speaking English to the plaintiff, he told her that:

A. Accredited would not provide her one loan at 30-years term at the fixed rate of 6.00%, but that it would provide 2 loans to her -- a 1st Loan in the amount of $450,000.00 at

8.400% which would remain fixed over thirty years and that when she made payments on this 1st Loan she would pay interest and principle and a 2nd Loan in the amount of $115,000.00 at 11.650%.which would be at an adjustable rate that could go up or down over time and that when she made payments on this 2nd Loan she would pay interest and principle. DOE 3 told the plaintiff what her initial monthly payments would be. DOE 3 told the plaintiff it was in her best interest to sign for these two loans, even though they were not at the then-current interest rate of about 6.00 percent because she would not have to make any down payment in order to purchase the property, and that because she did not have 20% of the total value of the property, or $115,000.00 to make the down payment, this was the only way she would be able to purchase the property because the 2nd Loan in the amount of $115,000.00 would serve to finance the down payment entirely. DOE 3 told the plaintiff that she could easily refinance both of the loans in a couple of years.

B. That she should sign a stack of loan documents to obtain the 15' Loan and 2nd Loan because in a couple of years the price of the Subject Property would go up very high and she could easily refinance the loans at a low rate of interest which he expected would be in effect in a couple of years.

**26. GOLDEN STATE'S AND DOES 1 THROUGH 10'S AND ACCREDITED'S OMMISSION OF MATERIAL FACTS REGARDING THE 1ST and 2ND LOANS MADE TO THE PLAINTIFF AT THE TIME SHE SIGNED THE 1ST NOTE AND 2nd NOTE AND OTHER LOAN DOCUMENTATION FOR THE ACCREDITED LOANS.**

The plaintiff allege that DOE 3, speaking English, did not tell the plaintiff the following items A through I at the time she was at Golden State's office and signed the loan documents:

A. There were prepayment penalties on the 1st Loan and 2nd Loan.

B. That the interest rate on the 1st Loan was adjustable and could go up over time and was very likely to go up.

C. That the 2nd Loan was an interest only loan with a balloon payment.

D. That in fact, she was required by the Lender to owner-occupy the Subject Property within six months after closing of escrow unless there was an exigent circumstance.

E. That Golden State was to take from the loan proceeds a Loan Origination Fee of $4,000.00, and a Processing fee of $995.00 and that the "Yield Spread" to Golden State was "$5,175.00 POC' That Golden State was obtaining said Yield Spread fee because when it obtained a higher interest rate at loan from Accredited, Accredited awarded it such a fee. Golden State failed to tell the plaintiff that it could have obtained for her a more favorable loan at a lower interest rate, because it wanted to obtain this fee from Accredited.

F. That said 1st loan was a negative amortization loan which was predatory as set forth in paragraph 32 incorporated by reference. That negative mortization was certain to occur if the plaintiff made initial monthly payments at the teaser rate of 8.400% and according to the schedule in the TILDS.

G. That the initial interest rate on the plaintiff's 1st Loan was discounted.

H. DOE 3 failed to read the loan papers to her and to have them read to her in her native language URDU. DOE l did not read or disclose to the plaintiff the Annual Percentage Rate (hereinafter "APR") regarding the 15' Loan and 2nd Loan. DOE 3 failed to read the Final Truth-In-Lending Disclosure Statement (hereinafter "TILDS") to the plaintiff and to tell her what it disclosed.

27. **THE 1ST LOAN AND 2ND LOAN WERE PREDATORY LOANS IN THAT 1) THE 1ST LOAN INVOLVED NEGATIVE AMORITZATION AND 2) THE 1ST LOAN AND 2ND LOAN WERES UNDERWRITTEN WITHOUT REGARD TO THE ORROWER'S ABILITY TO REPAY THE LOANS.**

The plaintiff alleges that the 1st Loan was a predatory loan as follows:

A. The interest rate on plaintiffs 1st loan was pegged to a variable index — the LIBOR index. However, the initial interest rate on plaintiff s loan was discounted and not based on the LIBOR index. Instead, it was based on a "teaser" rate of 8.400 % and the first monthly payment was $3,504.46 and was to be in effect for two years, after which the Change Date would occur every six months and the interest rate would be adjusted by adding 5.400% to the then-current LIBOR index. The "Final Truth-In-Lending Disclosure Statement (hereinafter "TILDS") discloses l0.516% as the APR on the plaintiffs 1st loan. The APR is placed in a box explaining that the APR is "The cost of your credit as a yearly rate. The TILDS also includes a payment schedule as follows:

**Number of Payments Amount of Payments** are due monthly beginning

| Number of Payments | Amount of Payments | |
|---|---|---|
| 24 | $3,504.46 | 1 1/1/2006 |
| 6 | $3,986.03 | 11/1/2008 |
| 329 | $4,307.03 | 05/1/2009 |
| 1 | $4,303.18 | 10/1/2036 |

Said TILDS discloses under the box entitled "Variable Rate Feature" that: "This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier. The Current index rate is 5.454." Therefore, given that the plaintiff's initial interest rate was 8.400%,

it was not based on the LIBOR index plus the addition of 5.400%, because the TILDS stated

initial index rate of 5.454% plus 5.400 would have been 10.854%. Thus, the initial interest rate

was not based on the index used to make later adjustments. Although the payment schedule was

based on the teaser rate of 8.400%, the actual interest rate changed after plaintiff's first monthly

payment and it was in fact, at least the APR rate of 10.5 16% calculated according to the LIBOR

index, instead of the teaser rate of 8.400%. While the actual interest changed almost

immediately, said initial minimum payments for the first two years of the loan were based on the

initial teaser rate. Thus, if the plaintiff made the initial payment for two years and made

payments according to the schedule disclosed in the TILDS, her payments would not cover the

interest due on the mortgage during the first two years. The principal of the 1st Loan was

therefore scheduled to increase if plaintiff made payments according to the TILDS. This process

is known as negative amortization. Negative amortization occurs when a consumer's required

minimum payment on a loan is less than the full amount of interest and fees due each month. As

a result, when the consumer makes only the minimum payment, the underlying principal owed

increases. The principal amount to repay could be greater than the amount originally borrowed.

Assuming that the value of the home remains constant, negative amortization would cause the

borrower to lose equity in her home because as principal grows during the negative amortization

period, the amount of interest also increases. The plaintiff is informed and believes and thereon

alleges that she did lose equity in her home because of this negative amortization 1st loan and the

overall price of the loan increased. The Office of the Comptroller of the Treasury in its OCC

Advisory Letter -- AL-2003-2 — entitled Guidelines for National Banks to Guard Against

Predatory and Abusive Lending Practices dated February 21, 2003, (hereinafter "OCC Advisory

Letter" stated that negative amortization loans are a predatory and abusive lending practice.

    B. The plaintiff incorporates by reference paragraphs 29, 33, 34 and 35. The plaintiff
alleges that the 1st Loan and 2nd Loan were predatory because they was underwritten
predominantly on the basis of the liquidation value of the collateral, without regard to the

borrower's ability to service and repay the loan according to its terms absent resorting to that collateral. This abusive practice leads to "equity stripping." When a loan has been made based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan, based on the borrower's current and expected income, current obligations, employment status, and other relevant financial resources, the lender is effectively counting on its ability to seize the borrower's equity in the collateral to satisfy the obligation and to recover the typically high fees associated with such credit. The OCC Advisory letter, described in this paragraph, section A, states that such loans are predatory and abusive credit practices and lead to foreclosure rates higher than the norm.

**28.     GOLDEN STATE'S AND DOES 1 THROUGH 10 AND ACCREDITED'S REQUIREMENTS REGARDING PLAINTIFF'S SHOWING HER FINANCIAL CONDITION AND HER OWNER-OCCUPYER STATUS AT THE TIME SHE SIGNED THE LOAN DOCUMENTS.**

At the time the plaintiff signed the loan documents for the 1st and 2nd loan at Golden State's Office, DOE 3, speaking English told the plaintiff that:

A. The loans were being obtained from Accredited through a "reduced documentation program" and that she only had to provide proof of 3 months bank statements and a copy of her California child care license. The plaintiff produced her child care license which she had obtained in June 2006 and also produced her 3 months of statements regarding her joint bank account with her husband as set forth in Paragraph 29 D incorporated by reference. At the time the plaintiff signed the loan documents, she told DOE 3 that she did not know when she could move into the Subject Property to supervise child care on its premises because she did not have yet have funds to convert the property into a child care facility and did not yet have customers to place into it. The plaintiff told him that using the Subject Property for her child care business was her dream. The plaintiff told him that she hoped to obtain the funds, convert the property and obtain customers as soon as possible and that she would then spend extensive time in the Subject Property to supervise child care and would reside in both the Subject Property and in the Blanchard Street property. DOE 3 told her that there was no problem regarding what she told him about her ability to owner-occupy the Subject Property and that she still qualified as an owner-occupier of the subject property and that she should sign the loan documents that she was a "owner-occupier" in order to obtain the two loans.

B. **ACCREDITED'S INSTRUCTIONS TO THE TITLE COMPANY**. In fact, the Lender, Accredited's Instructions, issued September 1, 2006, which were part of the loan documents, that the plaintiff did not read or understand at the time due to her limited English reading ability and the fact that DOE 3 did not employ a translator to read the following relevant parts to her in Urdu, contained a section entitled "ADDENDUM TO LENDERS INSTRUCTIONS, Continued" which stated in relevant part that the plaintiff:

29.     Must provide satisfactory 12 months rental history via 3 cancelled checks + VOR

30.     Copy of business license & proof of 2 years in current business for self-employed applicant(s) need proof for 2004.

31.     Assets in the amount of $11,000 to be verified via bank statements or VOD.

32.     Provide evidence that borrower is co-owner of AR Imaging. closing agent — certified copy of interpousal transfer deed. At the time the plaintiff signed the Accredited loan documents, the plaintiff did not provide proof of her being in a self-employed business for 2 years. In fact she had been in business since only June 2006, for approximately 3 months. The plaintiff did not show assets of $11,000, but only showed joint bank account statements for three months, in which each month, approximately $2,000.00 represented her own income, $1,000.00 represented her husband's income and $7,000.00 represented their joint savings over time. The plaintiff told DOE 3 these facts about the sources of the approximately $10,000.00 as evidenced in the June, July and August 2006 joint bank statements. The plaintiff did not provide any proof of any 12 months rental history. In fact GOLDEN STATE and DOES 1 through 10, knew that the plaintiff had just purchased the Blanchard Street property, because they had procured the two loans for her to purchase this property six months before, and they knew she lived there. The plaintiff did not provide any evidence she was a partner in her husband's business, AR Imaging, and in fact the plaintiff was not a partner in his business and had zero interest in said business, and her husband was contributing zero funds to back the plaintiffs obtaining the loan(s) to purchase the Subject Property and he intended to provide zero funds in the future to help her pay for the loans. In fact, DOE 3 told the plaintiff and her husband that her husband had zero responsibility for the procurement of the loans and for paying the loans because the plaintiff would execute an Interspousal Transfer Deed. See Exhibit B, a true and correct copy of said instrument recorded on 9/18/06 which the plaintiff did in fact execute.

**33.     PLAINTIFF'S JUSTIFIABLE AND REASONABLE RELIANCE ON THE**

**REPRESENTATIONS OF GOLDEN STATE, DOES 1 THROUGH 10 AND ACCREDITED.**

The plaintiff, at that time she signed the loan documents, had limited English language ability, especially in regard to reading English and she could not read and understand almost all of the terms in the loan documents which were technical loan terms. Therefore, she completely relied upon what DOE 3 told her was in the loan documents and she completely believed what DOE 3 said to her. The plaintiff believed all the representations of the broker and Golden State and Does 1 through 10 as set forth herein and she signed the loan papers for the 1st Loan and the 2nd Loan and signed all other papers DOE 3 gave her to sign because DOE 3 told her the documents were correct and it was in her best interest to sign them. Thereby, the plaintiff obtained the 1st Loan and the 2nd Loan according to a consumer credit transaction and written contract entered into between Accredited and the plaintiff in the form of:

The 1st Deed of Trust described herein and incorporated by reference, a true and correct copy of which is attached as Exhibit D.

The 1st Promissory Note described herein and incorporated by reference, a true and correct copy of which is attached as Exhibit C.

The 2nd Deed of Trust described herein and incorporated by reference, a true and correct copy of which is attached as Exhibit F.

The 2nd Promissory Note described herein and incorporated by reference, a true and correct copy of which is attached as Exhibit E.  The owners of the Subject Property executed a Grant Deed to the plaintiff, a true and correct copy of which is attached hereto as Exhibit A.

34.    **THE REPRESENTATIONS OF GOLDEN STATE AND ACCREDITED WERE, IN FACT, FALSE REGARDING THE PLAINTIFF'S HAVING ENOUGH INCOME TO QUALIFY FOR THE 1ST AND 2ND LOANS.**

In fact, the representations of Golden State, Does 1 through 10 and Accredited were false in that the plaintiff did not have enough income to qualify for the 1st Loan and 2nd Loan to

1  purchase the Subject Property. In fact, the 1st Loan for the sum of $460,000.00 was a "6-month"

2  adjustable rate mortgage at the initial two year teaser rate of 8.400%, 1 with the initial monthly

3  payment due in the amount of $3,504.46 and the 15 Loan had a prepayment penalty as set forth

4  in more detail herein and incorporated by reference. The 2nd Loan in the amount of $1 15,000.00

5  was a 15-year interest only loan with a balloon payment due in l5 years, on October l, 2021. The

6  monthly interest rate was ll.650% interest rate and the first payment due on 11/1/06 was in the

7  amount of $1,152.02. Therefore, upon signing the loan documents for the 1st Loan and 2nd Loan,

8  the plaintiff incurred debt regarding both loans in the total amount of $575.000.00 and total

9  monthly payments of $4,656.48. This was in addition to the two loans on Blanchard Street in the

10  total amount of $685,000.00 and the monthly payments for these two loans of $4,467.66.  After

11  having obtained the 1st Loan and 2nd Loan on the Subject Property, the plaintiff whose monthly

12  income was at that time approximately $2,000.00 per month and whose total cash assets were

13  $7,000.00 in joint husband and wife savings, was, after the loan documents were signed, carrying

14  4 loans totaling $1,260,000.00 and was responsible for 4 monthly payments totaling $9,124.14.

15  Therefore the plaintiff, who should have been qualified to pay only about 31% to at most 55% of

16  her gross income in loan-to-income ratio to pay for mortgage loan(s), was totally qualified to

17  obtain the 1st Loan and 2nd Loan to purchase the Subject Property and Golden State and DOES l

18  through 10 and Accredited knew this. However, DOE 3 told her she did qualify and obtained

19  said loans from Accredited for her, dooming her to eventually be unable to make payments on

20  them.

21  **35.    THE REPRESENTATIONS OF GOLDEN STATE AND ACCREDITED**

22  **REGARDING THE TERMS OF THE LOAN WERE, IN FACT, FALSE.**

23  The plaintiff alleges that said the representations of Golden State, Does 1 through 10 and

24  Accredited were, in fact, false in that:

25  A. There were, in fact, prepayment penalties on the 1st Loan and 2nd Loan.

B. The interest rates on the 1st Loan was, in fact, adjustable every six months after the initial two year fixed teaser rate, and could go up over time and was likely to go up.

C. The 2nd Loan was, in fact, an interest only loan with a balloon payment.

D. That in fact, the plaintiff was required by the Lender to owner-occupy the Subject Property within six months after closing of escrow unless there was an exigent circumstance.

**36.    DESCRIPTION OF THE 1st PROMISSORY NOTE FOR $460,000.00 AND THE 1st DEED OF TRUST.**

On or about September 5, 2006, regarding the 1st Loan , among other documents, the plaintiff signed the following: the Adjustable Rate Note (hereinafter the "1st NOTE"), a true and correct copy of which is attached as Exhibit C which included the Adjustable Rate Rider and the Prepayment Charge rider to Note.

A.    **DESCRIPTION OF THE 1st PROMISSORY NOTE FOR** $460,000.00. The Promissory Note was for a loan in the amount of $460,000.00 plus interest payable to the Lender, Accredited Home Lenders, Inc. The Adjustable Rate Note states:

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

The loan was called a "LIBOR Six —Month Index" loan. The "Maturity Date" is October 1, 2036. The Note states: I will make my monthly payments on the 1st day of every month, beginning on November 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If on October l, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maternity Date."

The initial yearly interest rate was 8.400%. The initial payment was on November 1, 2006 was $3,504.46. The interest rate was to begin to change on October 1, 2008, the first

"change Date" and would change on the 1st of every sixth month thereafter, in accordance with the London market ("Libor") index. The Note states that: "Each date on which my interest rate could change is called a "Change Date." The new interest rates were to be calculated by adding Five and 4 tenths percentage points (5.400%) to the current LIBOR index, rounded off to the nearest 1/8 of one percentage point (0.125%). The interest rate to be paid at the first change date was not be greater than 9.900% or less and 8.400%. Thereafter the interest rate was to never be increased or decreased on any single change date by more than 1.500% from the rate of interest that was paid the preceding six months. The interest rate was never to be greater than 15.400% or less than 8.400%.  There is no mention of MERS in the 1ST Note.

      B.    **THE ADJUSTABLE RATE RIDER**. The Adjustable rate Rider states the same information about the Interest Rate and monthly payment change, change date, the index, calculation of changes, limits on interest rate changes, effective date of changes, and notice of changes as set forth in the Note.

      C.    **THE PREPAYMENT CHARGE RIDER TO NOTE**. The Prepayment Charge Rider to Note allows for full prepayment or partial prepayments and states:

> However, if the aggregate amount of the prepayment(s) made during any 12 month period within 24 months of the date of the Note exceeds 20% of the original principal amount of the Note, than as consideration for the acceptance of such prepayments I agree to pay the holder of the Note a sum equal to 6 months interest on the amount by which "such prepayment(s) exceed 20% of the original principal amount of the Note. Any prepayments made after said initial 24 month period shall not be subject to any prepayment charge.  I/we confirm that prior to the closing of this mortgage loan, I/we were offered the option of obtaining a mortgage loan that did not+ require payment of a prepayment charge and that I/we are agreeing to this prepayment charge in exchange for a monetary benefit, including but not limited to a rate or fee reduction.

      D.    **THE DEED OF TRUST REGARDING THE 1ST LOAN**. Additionally, based upon ' information and belief, in connection with the 1st Loan transaction, Accredited took security interests in the Subject Property in the form of a Deed of Trust recorded with the Alameda County Recorder's Office on September 18, 2006, Doc. No. 20063518-7, ("the 1st

DOT"). The plaintiff also signed the security instrument -- the Deed of Trust recorded 9/18/06 (hereinafter the "1st DOT"), a true and correct copy of which is attached as Exhibit D. The 1st DOT, the following is stated regarding the parties:

> "Security Instrument means these documents, which is dated September 1, 2006 together with all riders to this document. "Borrower" is Rahila Khan, a married woman as her sole and separate property... "Lender" is Accredited Home Lenders, Inc.. . "Trustee is Alliance Title. "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, Tel (888) 679-MERS.

In addition the 15' DOT states:

1.     **OCCUPANCY**: Borrower shall occupy, establish and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

37.     Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but no prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify; (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cure on or before the date specified in the

PLAINTIFFS COMPLAINT FOR (1) FRAUD; (2) VIOLATIONS OF TRUTH IN LENDING ACT; (3) VIOLATIONS IN REAL ESTATE SETTLEMENT PROCEDURES ACT; (4) VIOLATIONS OF CALIFORNIA CIVIL CODE SECTIONS 2923.5 and 2924

27

notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expense incurred in pursing the remedies provide in this Section 22, including, but not limited to reasonable attorney's fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of this notice as prescribed by applicable Law to Borrower and to the other persons prescribed by Applicable Law.  Trustee shall give public notice of sale to the persons and in the manner prescribe by Applicable Law. 15. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borer's notice address if sent by other means. ...The notice address shall be the Property Address unless Borrower has designed a substitute notice address by notice to the Lender. .

**38. DESCRIPTION OF THE 2ND PROMISSORY NOTE FOR $115,000.00 AND THE 2ND DEED OF TRUST.**

On or about September 5, 2006, regarding the 2nd Loan, the plaintiff signed the following: a 2nd Promissory Note (hereinafter the "2nd Note"), a true and correct copy of which is attached as Exhibit E, and signed an Adjustable Rate Rider and the security instrument. The plaintiff is informed and believes and thereon states that this 2nd Note constituted a 15-year interest only loan at l 1.650% interest rate with a balloon payment due in l5 years, on October 1, 2021. The first payment due on 11/ 1/06 was in the amount of $1,152.02. It was an interest only loan. Additionally, based upon information and belief, in connection with the 2nd Loan

1 | transaction, Accredited took a security interests in the Subject Property in the form of a Deed of

2 | Trust recorded with the Alameda County Recorder's Office on September 18, 2006 -- the second

3 | Deed of Trust ("the 2nd DOT"), a true and correct copy of which is attached as Exhibit F.

4 | Regarding the 2nd Loan, a Deed of Trust and Request for Notice of Default recorded 9/18/06,

5 | Alameda County, Doc. No. 2006351808 (Exhibit F) states that the lender is Accredited, the

6 | trustee is Alliance Title and the beneficiary is MERS. Said 2nd Deed of Trust states: ". . ..and the

7 | beneficiary MERS (solely as nominee for Lender, as hereinafter defined, and Lender's

8 | successors and assigns), MERS is organized and existing under the laws of the State of

9 | California and has an address of 15090 Avenue of Science, San Diego, CA 92128."

10 |     39.    **THE FIRST CHANGE OF LOAN SERVICER — TO COUNTRYWIDE.**

11 |     On or about November 1, 2006, the plaintiff commenced making timely and full monthly

12 | payments to Accredited for the 1st DOT and 2nd DOT. On or about February 2007, the plaintiff is

13 | informed and believes and thereon alleges that Countrywide and Accredited represented to the

14 | plaintiff that she was to make monthly payments for the 1st DOT and 2nd DOT to Countrywide,

15 | and not to Accredited, and she commenced to make timely and fully monthly payments to

16 | Countrywide. The plaintiff is informed and believes and thereon alleges that Countrywide was

17 | the servicer of the plaintiffs Loans, and in fact Countrywide and Accredited told her that

18 | Countrywide owned both loans.

19 |     **40.    OVERVIEW OF THE CREATION OF THE MORGAN STANLEY TRUST**

20 | **AND ACCREDITED'S POSSIBLE SALE AND TRANSFER OF THE PLAINTIFF'S 1ST**

21 | **LOAN AND 2ND LOAN TO SAID TRUST AS DESCRIBGED IN THE "FREE WRITING**

22 | **PROSPECTUS" FILED WITH THE SEC ON MARCH 23, 2007.**

23 |     The plaintiff is informed and believes, based upon the face of the purported "Assignment

24 | of Deed of Trust dated 6/28/11, as set forth and incorporated by reference, that some "beneficial

25 | interest" under the 1st Loan was somehow conveyed at some time to "Deutsche Bank National

1  Trust Company, as trustee for the holders of the Morgan Stanley Home Equity Loan Trust, 2007-

2  2, Mortgage Pass through Certificates, Series 2007-2". Plaintiff is informed and believes and

3  alleges based upon relevant SEC filings that Accredited may have attempted to securitize the

4  plaintiffs 1st Loan and 2nd Loan by grouping them into a collateral pool which was sold to the

5  Morgan Stanley Trust pursuant to a Pooling and Servicing Agreement. This trust raised cash to

6  pay for the loans by selling bonds or certificates to investors. On March 23, 2007, the Morgan

7  Stanley Trust filed its Free Writing Prospectus under Securities Act Rules with the SEC —its

8  first filing with the SEC. See said document on the SEC website at:

9  http://wvvvv.sec.gov/Archives/edgar/data/1030442/000091412107000758/ms7888449-fwp.txt

10      The Morgan Stanley Trust's SEC CIK Code for all SEC filings is 0001393674. The Free

11  Writing Prospectus was in regard to the issuance of Mortgage Pass-Through Certificates, Series

12  2007-2, in the amount of $846,247,000 and the "Summary" pages S-6 and S-7 of said Free

13  Writing Prospectus, stated that the "Transaction Parties" were:

14      Sponsor: Morgan Stanley Mortgage Capital Inc.,
Depositor. Morgan Stanley ABS Capital I Inc.

15  Issuing Entity. Morgan Stanley Home Equity Loan Trust 2007-2.

16  Trustee. Deutsche Bank National Trust Company, a national banking
association with its corporate trust office at 1761 East St. Andrew Place, Santa Ana,

17  California 92705, Attention: Trust Administration MS07X2, telephone number (714) 247-6000.

18  

19  Master Servicer and Securities Administrator: Wells Fargo Bank, National
Association, a national banking association.

20  Servicers: Saxon Mortgage Services, Inc.

21  Countrywide Home Loans Servicing LP, a Texas limited partnership with its
principal executive offices at 7105 Corporate Drive, Plano, Texas 75024,

22  telephone number (972) 526-6285.

23  Original Loan Sellers:

24      Substantially all of the mortgage loans were purchased by the sponsor from the following
loan sellers:

25  First NLC Financial Services, LLC

Wilmington Finance, Inc.
Accredited Home Lenders, Inc., a California corporation with its principal executive offices at 15253 Avenue of Science, Building 1, San Diego, California 92128, telephone number (858) 676-2100.

The Interest Rate Swap Provider and Interest Rate Cap Provider was:

Morgan Stanley Capital Services Inc., a Delaware corporation with its principal executive offices at 1585 Broadway, New York, New York 10036, telephone number (212) 761-4000.

Morgan Stanley Capital Services Inc. conducts business in the over-the-counter derivatives market, engaging in a variety of derivatives products, including interest rate swaps, currency swaps, credit default swaps and interest rate options with institutional clients.

41.    THE MORGAN STANLEY TRUST'S "PROSPECTUS" AND "POOLING AND SERVICING AGREMENT" AND NEW YORK GOVERNING LAW.

On April 2, 2007, the Morgan Stanley Trust filed a Prospectus pursuant to Rule 424(b)(5) ("the Prospectus") with the SEC, an true and correct excerpt of which is attached as Exhibit I. Said Prospectus was for the issuance of the same amount of certificates and included the same parties to the transactions forming said trust, as are set forth in the March 23, 2007 Free Writing Prospectus, described in Paragraph 40 incorporated by reference. The Morgan Stanley Trust is a REMIC, a "real estate mortgage investment conduit" within the meaning of Section 860D of the Internal Revenue Code. See section 860A through 860G of Subchapter M of Chapter 1, Subtitle A of the Internal Revenue Code, and related provisions and regulations, rulings or pronotmcements promulgated thereunder. On March 1, 2007, the Pooling and Servicing Agreement (hereinafter the "PSA") for said trust was filed with the SEC.  A true and correct excerpted copy of the PSA is attached as Exhibit J. The Morgan Stanley Trust was an express business trust formed under New York law as set forth in subsection (c ) of Article II of the PSA entitled Conveyance Of Mortgage Loans; Representations And Warranties. Thus, the trust was and is governed by New York business trust law, New York statutes, including the New York

PLAINTIFFS COMPLAINT FOR (1) FRAUD; (2) VIOLATIONS OF TRUTH IN LENDING ACT; (3) VIOLATIONS IN REAL ESTATE SETTLEMENT PROCEDURES ACT; (4) VIOLATIONS OF CALIFORNIA CIVIL CODE SECTIONS 2923.5 and 2924

31

Uniform Commercial Code and New York common law (hereinafter "New York governing law"). The PSA required Accredited, which sold mortgage loans to the trust, to endorse the original mortgage notes ("Notes") and deliver the them to the trustee of the Morgan Stanley securitization trust by the "Closing Date" Article I of said PSA defined the "Closing Date" as April 3, 2007. In order for the transfer to be valid, pursuant to the terms of the PSA, pursuant to New York Governing Law, and in conformity with IRS rules pertaining to favorable tax treatment of a REMIC, the properly endorsed, original Notes had to be delivered before the trust closed on the Closing Date or within 90 days thereafter pursuant to the Eighth Amended And Restated Mortgage Loan Purchase And Warranties Agreement Subsection 6.03 Delivery of Mortgage Loan Documents which states:

> In the event any document required to be delivered to the Custodian in the Custodial Agreement, including an original or copy of any document submitted for recordation to the appropriate public recording office, is not so delivered to the Custodian, or to such other Person as the Purchaser shall designate in writing, within 90 days following the related Closing Date (other than with respect to the Assignments of Mortgage which shall be delivered to the Custodian in blank and recorded subsequently by the Purchaser or its designee), and in the event that the Seller does not cure such failure within 30 days of discovery or receipt of written notification of such failure from the Purchaser, the related Mortgage Loan shall, upon the request of the Purchaser, be repurchased by the Seller at the price and in the manner specified in Subsection 9.03.

Therefore, according to the PSA, any transfer of Notes outside of that period would violate the governing instrument of the trust. The failure to follow the terms of the PSA in transferring a Note would invalidate the transfer and mean that the Note never became part of the Trust. If the Morgan Stanley Trust did not receive the "Note" regarding the plaintiff's 1st Loan in a valid form required by the PSA by the Closing Date, or if there was a defect in the transfer, the Lender could cure the defect within 30 days after the defect was discovered, providing the defect was discovered within 90 days after the Closing Date, as provided by the PSA. If the trust did not receive the Note, the Note never became part of the Morgan Stanley Trust. Therefore, the mortgages or deeds of trust were to be conveyed to the Morgan Stanley Trust by the Closing date

or within the 90-day period thereafter, in order for them to be part of the trust and in order to avoid violating relevant New York law and IRS regulations.

**42.     THE LOCATION AND EXISTENCE, IF ANY, OF THE 15' NOTE AND 2ND NOTE AND THE 1ST DOT AND 2ND DOT ARE UNKNOWN TO THE PLAIINTIF F AT THIS TIME.**

The plaintiff is informed and believes and therefore alleges, based upon the Assignment of Deed of Trust, Exhibit G that the purported beneficiary who initiated the foreclosure proceedings through its agent Recontrust, is MERS. In said Assignment, MERS states it is the "holder" of the 1st DOT and 1st Note which it purports to assign to Deutsche as trustee for the Morgan Stanley Trust.

The plaintiff does not know where the original promissory 1st Note and 2nd Note and lst DOT and 2nd DOT, are located, if they still exist, for two essential reasons:

(1) In the PSA, Exhibit A -- the Mortgage Loan Schedule -- which identified all the Accredited loans transferred to the Morgan Stanley Trust has been left blank in the PSA and only states: "(Delivered to the Trustee on the Closing Date)." This Exhibit A is attached to the Assignment and Recognition Agreement, dated April 3, 2007, which is Exhibit Q in the PSA dated March 1, 2007. The plaintiff does not know where the Assignments of the 1st DOT and 2"d DOT from Accredited to Deutsche are on the MERS system, if they exist. The MERS system is not public, but is a recording system outside of the local recorder's offices. During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system.

(2) In the PSA, Article II entitled Conveyance Of Mortgage Loans. Schedule I -- the Mortgage Loan Schedule — referred to in Article II, Section 2.02 Acceptance by the Trustee of the Mortgage Loans requires that within 90 days after the Closing Date, the Trustee Deutsche was required to deliver to the Depositor and the Servicers, a Document Certification and Exception Report, to the effect that, as to each applicable Mortgage Loan listed in the Mortgage Loan Schedule — Schedule I all documents were in its possession, reviewed and "appear regular on their face". Within 90 days after the Closing Date, the applicable Servicer, based solely on the list of MERS Designated Mortgage Loans and screen printouts from the MERS System provided to such Servicer by each applicable Originator no later than 45 days after the Closing Date) shall confirm, on behalf of the Trust, that the Trustee is shown as the Investor with respect to each MERS

Designated Mortgage Loan on such screen printouts Schedule I has been left blank in the PSA and only states: "(Delivered to the Securities Administrator and the Trustee and not attached to the Pooling and Servicing Agreement).

43. **RELEVANT PARTS OF THE PSA APPLY TO SHOW THAT MERS HAD NO AUTHORITY WHATSOEVER AS THE "HOLDER" OF THE 1ST DOT AND THE 1ST NOTE TO MAKE AN ASSIGNMENT OF THE 1ST nor AND THE 1ST NOTE TO THE MORGAN STANLEY TRUST, THEREFORE THE ASSIGNMENT IS VOID AB INITIO.**

Relevant parts of the PSA show:

A. **THE PSA REQUIRED ACCREDITED TO DELIVER THE PLAINTIFF'S 1ST AND 2ND NOTES TO THE CUSTODIAN DEUTSCHE BY THE CLOSING DATE OR 90 DAYS THEREAFTER.**

Pursuant to the PSA, Accredited was required to deliver to the Custodian Deutsche, the 1st Note and 2nd Note in the form required by Exhibit A, "Contents of Each Mortgage File", attached to the Eighth Amended and Restated Mortgage Loan Purchase and Warranties Agreement dated August 1, 2006 which is referred to in the Assignment and Recognition Agreement, dated April 3, 2007, which is Exhibit Q in the PAS dated March 1, 2007. This Exhibit A specifically required that the Seller Accredited was to deliver to the Custodian Deutsche, in pertinent part: "a. the original Mortgage Note bearing all intervening endorsements, endorsed "Pay to the order of, without recourse" and signed in the name of the last endorsee (the "Last Endorsee") by an authorized officer.

B. **THE PSA REQUIRED ACCREDITED TO DELIVER THE ASSIGNMENTS OF THE 1ST AND 2ND MORTAGES -- the 1st DOT AND 2nd DOT -- TO THE CUSTODIAN DEUTSCHE BY THE CLOSING DATE OR 90 DAYS THEREAFTER.**

PLAINTIFFS COMPLAINT FOR (1) FRAUD; (2) VIOLATIONS OF TRUTH IN LENDING ACT; (3) VIOLATIONS IN REAL ESTATE SETTLEMENT PROCEDURES ACT; (4) VIOLATIONS OF CALIFORNIA CIVIL CODE SECTIONS 2923.5 and 2924

34

Pursuant to the PSA, Accredited was required to deliver to the Custodian Deutsche, the assignment of the 1st DOT and the 2nd DOT in the form required by the PSA in Exhibit A, "Contents of Each Mortgage File", attached to the Eighth Amended and Restated Mortgage Loan Purchase And Warranties Agreement dated August 1, 2006 which is referred to in the Assignment And Recognition Agreement, dated April 3, 2007, and which is Exhibit Q in the PSA. This Exhibit A specifically required that the Seller Accredited was to deliver to the Custodian, Deutsche, in pertinent part: "(e) except with respect to each MERS Designated Mortgage Loan, the original Assignment of Mortgage for each Mortgage Loan, in form and substance acceptable for recording.

Plaintiff's 1st DOT described in paragraph 37 (Exhibit D), and 2nd DOT described herein and attached as (Exhibit F) purported on the face of the instruments to involve MERS. Regarding MERS Designated Mortgage Loans, Article I of the PSA and the Eighth Amended and Restated Mortgage Loan Purchase and Warranties Agreement dated August l, 2006 provided the following relevant definitions:

MERS Designated Mortgage Loan: Mortgage Loans for which (a) the Seller has designated or will designate MERS as, and has taken or will take such action as is necessary to cause MERS to be, the mortgagee of record, as nominee for the Seller, in accordance with MERS Procedure Manual, (b) the Seller has designated or will designate the Purchaser as the Investor on the MERS(R) System, and (c) the Seller has designated or will designate the Custodian as the Custodian on the MERS(R) System.

MERS(R) System: MERS mortgage electronic registry system, as more particularly described in the MERS Procedures Manual.

Without having access to MERS electronic system, which is outside public purview, or without having access to reports made for the benefit of the Morgan Stanley Trust to ensure assignments of deeds of trusts into the trust, the plaintiff cannot determine if Accredited, in fact,

1   designated MERS to be "the mortgagee of record, as nominee for the Seller "in accordance with

2   MERS Procedural manual and in fact, designated the" purchaser (Morgan Stanley Mortgage

3   Capital, Inc.). as the Investor on the MERS System and in fact, designated "the Custodian

4   (Deutsche National Bank Trust Company) as the Custodian on the MERS System.

5        However, according to the PSA's definition of MERS Designated Mortgage Loan,

6   Accredited was required to designate MERS as the "mortgagee of record, as nominee for the

7   Seller." Pertinent to the plaintiff's case, Accredited was not required to designate MERS as a "M

8   of the 1st DOT and 1st Note.

9   **C.    THE PSA REQUIRED THE DEPOSITOR MORGAN STANLEY ABS**

10   **CAPITAL I INC. T0 DELIVER THE 1st NOTE AND 2nd NOTE TO THE CUSTODIAN**

11   **DEUTSCHE BY THE CLOSING DATE OR WITHIN 90 DAYS THEREAFTER.**

12        In addition to Accredited's duty to convey the Notes and Assignments of Mortgages to

13   the Custodian Deutsche, in order to establish the trust, the PSA required the Depositor Morgan

14   Stanley ABS Capital I Inc., to convey to the Trustee Deutsche Bank National Trust Company for

15   the benefit of the Certificate holders, without recourse, all of the Depositor's interest in the Trust

16   Fund and the Trustee Deutsche was required on behalf of the Trust accepted the trust fund on the

17   Closing Date. This requirement is set forth in the PSA in Article II entitled Conveyance of

18   Mortgage Loans, specifically in subsections (b), (i) and (v) below:

19        (b) In connection with the transfer and assignment of each Mortgage
20     Loan, the Depositor has delivered or caused to be delivered to the Trustee, for the benefit
    of the Certificate holders the following documents or instruments with respect to each
21     Mortgage Loan so assigned:
       (i) the original Mortgage Note bearing all intervening endorsements,
22     endorsed "Pay to the order of , without recourse" and signed(which may be by facsimile
    signature) in the name of the last endorsee by an authorized officer. To the extent that
23     there is no room on the face of the Mortgage Note for endorsements, the endorsement
    may be contained on an allonge, unless the Trustee is advised in writing by the applicable
24     Originator (if required by the applicable Purchase Agreement) or the Depositor, as
    applicable, that state law does not so allow; (v) the original Assignment of Mortgage for

25

each Mortgage Loan endorsed in blank, which may be included in a blanket assignment or assignments (except with respect to MERS Designated Mortgage Loans)

**D.     ARTICLE II OF THE PSA DID NOT REQUIRE THE DEPOSITOR MORGAN STANLEY ABS CAPITAL I, INC., TO DELIVER TO THE TRUSTEE DEUTSCHE BANK NATIONAL TRUST COMPANY AT THE CLSOING DATE, ASSIGNMENTS OF MORTAGES IF THEY WERE RECORDED IN THE MERS SYSTEM, BUT RATHER THAT THE "DEPOSITOR CAUSE THE TRUST TO BE SHOWN AS THE OVVNER OF THE MORGAGE LOANS ON THE MERS SYSTEMS. THE PSA REQUIRED THE APPLICABLE "SERVICER" TO CAUSE THE TRUST TO BE SHOWN AS THE OWNER OF THE MORTGAES ON MERS RECORDS, INSTEAD OF CONVEYING ASSIGNMENTS OF MORTGAGES.** Article II of the PSA entitled Conveyance of Mortgage Loans, states in relevant part.

> If any Mortgage has been recorded in the name of Mortgage Electronic Registration System, Inc. ("MERS") or its designee, no Assignment of Mortgage in favor of the Trustee will be required to be prepared or delivered and instead, the applicable Servicer shall take all reasonable actions as are necessary at the expense of the applicable Originator to the extent permitted under the related Purchase Agreement and otherwise at the expense of the Depositor to cause the Trust to be shown as the owner of the related Mortgage Loan on the records of MERS for the purpose of the system of recording transfers of beneficial ownership of mortgages maintained by MERS....

**E.     IN REGARD TO MERS DESIGNATED LOANS, ARTICLE II FURTHER REQUIRED THAT IF FORECLOSURE PROCEEDINGS OCCUR, THE APPLICABLE SERVICER SHALL THEN RECORD THE ASSIGNMENT OF MORTGAGE USING A SPECIFIC FORMAT.** Article II of the PSA entitled Conveyance of Mortgage Loans, states in relevant part:

> .....Notwithstanding the foregoing, however, for administrative convenience and facilitation of servicing and to reduce closing costs, the Assignments of Mortgage shall not be required to be completed and submitted for recording with respect to any Mortgage Loan (i) if the Trustee and each Rating Agency have received an Opinion of Counsel, satisfactory in form and substance to the Trustee and each Rating Agency to the effect that the recordation of such Assignments of Mortgage in any specific jurisdiction is not necessary to protect the Trustee's interest in the related Mortgage Note, (ii) if such

Mortgage Loan is a MERS Designated Mortgage Loan. . .. However, with respect to the Assignments of Mortgage referred to in clauses (i) and (ii) above, if foreclosure proceedings occur against a Mortgaged Property, the applicable Servicer shall record such Assignment of Mortgage at the expense of the related Originator (and at no expense to such Servicer) as required pursuant to the related Purchase Agreement. If the Assignment of Mortgage is to be recorded, the Mortgage shall be assigned to "Deutsche Bank National Trust Company, as trustee under the Pooling and Servicing Agreement dated as of March 1, 2007, Morgan Stanley Home Equity Loan Trust 2007-2."

Article I defines MERS Designated Mortgage Loans for purposes of the PSA as set forth above.

F.    **THE TRUSTEE'S CUSTODIAL FILE.** Article II of the PSA requires that "All such mortgage documents held by the Trustee as to each Mortgage Loan shall constitute the "Custodial File". The Custodial File is defined as "With respect to each Mortgage Loan, the file retained by the Trustee consisting of items (a) - (h) as listed on Exhibit K hereto." Exhibit K requires the same items -- item (i) regarding the Note(s) and item (v) regarding assignments of mortgages which are required in Article II entitled Conveyance Of Mortgage Loans, however Exhibit K designates said items as (a) and ( e) respectively.

**44.    THE ASSIGNMENT OF DEED OF TRUST RECORDED ON 6/28/11.**

On June 28, 2011, the Servicer Bank of America recorded, unbeknownst to the plaintiff at that time, the Assignment of Deed of Trust regarding the Subject Property (Exhibit G attached hereto) which states on its face:

"Recording Requested by: Bank of America. . .."

The face of said Assignment of Deed of Trust further states:

For Value Received, the undersigned holder of a Deed of Trust (herein "Assignor") whose address is 3300 S.W. 34th Avenue, Suite 101, Ocala, FL 34474 does hereby grant, sell, assign, transfer and convey unto Deutsche Bank National Trust Company, as trustee for the holders of the Morgan Stanley Home Equity Loan Trust, 2007-2, Mortgage Pass through Certificates, Series 2007-2 whose address is 09062 Old Annapolis Rd, Columbia, M.D. 20145 all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations thereon described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.  Original Lender: Accredited Home Lenders, Inc., a California Corporation Original Borrower(s): Rahila Kahn, a married woman as her sole ad separate property. Original Trustee: Alliance Title Date of Deed of Trust 9/ 1/2006 Original Loan Amount $460,000.00 Recorded in alameda County, CA on 9/18/2006, book N/A. page N/A and

Instrument number 006351807 in witness thereof, the und gned has caused this Assignment of Deed of Trust to be executed on 06-09-11. Mortgage Electronic Registration systems, Inc. Signature By: Tina Le Raybaud, Assistant Secretary.

**45.     THE ASSIGNMENT OF DEED OF TRUST RECORDED ON 6/28/11 DOES NOT MEET THE REQUIREMENTS OF THE PSA THEREFORE IT DOES NOT LAWFULLY ASSIGN THE 1ST DOT AND 1ST NOTE TO THE PURPORTED BENEFICIARY, THE MORGAN STANLEY TRUST, THEREFORE THE ASSIGNMENT IS VOID AB INITIO.**

In fact, according the PSA's definition of MERS Designated Mortgage Loan, the Seller Accredited was to designate MERS to be, the mortgagee of record, as nominee for the Seller, in accordance with MERS Procedure Manual. The PSA in no way requires or allows MERS to be designated as a "holder" of the deed of trust, instead the PSA states it can be designated as only a mortgage e of record, as nominee for the Seller.

The word "holder" is specifically defined in the New York Commercial Code and California Commercial Code1-201 (b) (20) essentially as follows: A holder is simply a party in possession of a note made out to that party or to bearer.  MERS in the Assignment of the Deed of Trust clearly states it "holds" the 1st DOT and somehow "holds" the 1st Note - yet the PSA does not authorize MERS to "hold" these. MERS cannot act beyond the authority given it in the PSA according to New York law. This is especially true because by the Closing Date or 90 days thereafter, the PSA required the 1st Note to be transferred by Accredited to the Custodian Deutsche and to be transferred by Morgan Stanley Abs Capital Inc. to the Custodian Deutsche. Therefore, only the Custodian Deutsch as of the Closing Date or 90 days thereafter is the "holder of the note" and if the Note is held by MERS as of the date of the Assignment, 6/28/11, then the Note is no longer part of the trust, or was never transferred into the trust by the Closing Date. A Note which is not in the trust as of the closing date is not part of the trust pursuant to New York Law and IRS regulations.

Specifically, MERS' acting as the holder of the 1st NOTE and the 1st DOT in its Assignment of Deed of Trust recorded on 6/28/11 to the Morgan Stanley Trust, contradicts the PSA which required the 1st Note to be delivered by Accredited to Deutsche and to be delivered by Morgan Abs Depositor to Dutch by the Closing Date April 3, 2007 or 90 days thereafter, so that in fact, the Morgan Stanley Trust was the holder of the note by the Closing Date or 90 days thereafter. MERS in fact cannot be the "holder" of the Note which was already conveyed four years ago to the Trust. or alternatively, if MERS in fact does actually "hold" the 1st Note as of the date of the recordation of the Assignment of the Deed of Trust — 6/28/ll — then, by direct inference, the 1st Note was never conveyed by Accredited to Deutsche at the Closing date, four years ago, and the Note was and is not part of the Morgan Stanley Trust, and said trust has no authority, in fact to initiate foreclosure proceedings against the plaintiffs Subject Property. According to the PSA, in order for the Note to be part of the Trust, the 15' Note was to be endorsed in the form of "Pay to the order of, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee by an authorized officer." It was to be delivered by Accredited to Deutsche by the closing date or 90 days thereafter. New York business trust law, and the New York Commercial Code required the 1st Note to be transferred and endorsed appropriately by Accredited to Deutsche by the closing date or 90 days thereafter. Therefore, MERS, in fact has no authority whatsoever to act as a "holder" to assign, the 1st DOT on June 28, 2011 to Deutsche, as trustee for the Morgan Stanley trust because that transfer, per the PSA had to have occurred on the Closing Date or 90 days thereafter, some four years ago.

For the foregoing reasons, the assignment is null and void ab initio and Deutsche is not the beneficiary of record entitled to initiate foreclosure proceedings, by itself or through its "agent for beneficiary" — Recontrust.

**46.     THE ROLE OF MERS IN THE ASSIGNMENT OF DEED OF TRUST RECORDED ON 6/28/11 DOES NOT MEET THE REQUIREMENTS SET FORTH IN**

**THE 1ST DEED OF TRUST, THEREFORE MERS HAD NO AUTHORITY WHATSOEVER TO ASSIGN THE 1ST DOT AND 1ST NOTE TO THE PURPORTED BENEFICIARY, THE MORGAN STANLEY TRUST, THUS SAID ASSIGNMENT IS VOID AB INITIO.**

MERS, in fact, has no authority whatsoever as a "holder" to make an assignment of the 1st DOT and the Note to the purported beneficiary Deutsche because in the 1st Deed of Trust recorded 9/18/06, as set forth herein and attached (Exhibit D), MERS is defined as solely a nominee for Lender and its successors and assigns and is the beneficiary. Said 1st Deed of Trust states:

> "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, Tel (888) 679-MERS.

Thus, it is shown on the face of the 1st DOT that MERS was not and is not a "holder" of the 1st Note and 1st DOT, because the 1st DOT refers to MERS as "nominee" and "beneficiary" under the 1st Deed of Trust, as set forth herein and attached as (Exhibit D). Therefore, MERS is only authorized when making said Assignment of Deed of Trust to act as a "nominee" and "beneficiary" — not as a "holder" of the 1st DOT and 1st Note. Thus, it is a violation of the PSA for MERS to act as a "holder" when it has no power to do so under the 1st DOT and when MERS cannot become the "holder" of the promissory notes that are secured by the deeds of trust, unless the rules of the Uniform Commercial Code, as adopted by California's Commercial Code or New York's Commercial Code are followed.

Furthermore, it is shown on the face of the 1st Note, that MERS, in fact, has no authority whatsoever as a "holder" to make an assignment of the 1st Note to the purported beneficiary Deutsche because the 1st Note does not identify MERS at all nor does it grant MERS any interest whatsoever in the mortgage debt. Again, MERS does not become the holder of the promissory

PLAINTIFFS COMPLAINT FOR (1) FRAUD; (2) VIOLATIONS OF TRUTH IN LENDING ACT; (3) VIOLATIONS IN REAL ESTATE SETTLEMENT PROCEDURES ACT; (4) VIOLATIONS OF CALIFORNIA CIVIL CODE SECTIONS 2923.5 and 2924

41

notes that are secured by the deeds of trust, unless the rules of the Uniform Commercial Code, as adopted by California's Commercial Code or New York's Commercial Code are followed. MERS is not a party to the Note and the record is barren of any representation that MERS, the purported assignee, had any authority to take any action with respect to the Note. Therefore, the Assignment of the Deed of Trust is not sufficient to establish an effective assignment of the 1st Note.

Furthermore, by law, even if the Assignment of the Deed of Trust is found to be valid, the assignment of the mortgage does not, in itself, also cause the assignment of the 1st Note. Thus the 1st Note could not have been assigned by MERS to the Morgan Stanley Trust. MERS only acted as the nominee or "beneficiary" under the 1st DOT. Since no evidence exists on the face of the 15' Note, as set forth herein and attached as (Exhibit C) that MERS is authorized to be the "holder" of the 15' Note, said 1st Note cannot be transferred to MERS as a "holder". MERS could only transfer, at most, only whatever interest it had in the 1st DOT and it had no interest whatsoever. The promissory note and the deed of trust are inseparable. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity in accordance with California Civil Code Section 2936.

For the foregoing reasons, the Assignment of Deed of Trust is null and void ab initio and Deutsche is not the beneficiary of record entitled to initiate foreclosure proceedings, by itself or through its "agent for beneficiary" — Recontrust.

**47. THE ASSIGNMENT OF DEED OF TRUST RECORDED ON 6/28/11 DOES NOT MEET THE REQUIREMENTS OF MERS' OWN "TERMS AND CONDITIONS", THEREFORE IT DOES NOT ASSIGN THE 1st DOT AND 1st NOTE TO THE PURPORTED BENEFICIARY, THE MORGAN STANLEY TRUST, AND THE ASSIGNMENT IS VOID AB INITI0.**

Furthermore, showing that MERS was an is not a "holder" of the 1st Note and 1st DOT is MERS own "Terms and Conditions", a true and correct excerpt of which is attached hereto as Exhibit 1, which states in relevant part:

> MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law.(Emphasis supplied.)

Said "MERS Terms and Conditions" (Exhibit K) was filed in Re Michele Dart, U.S. Bankruptcy Court, District of Nevada, Case #08-11007 at {I 2, Docket #47-7.

As set forth in said "Terms and Conditions", it is clear that MERS, itself, states that in fact, it has no authority whatsoever to act as a "holder" to assign the 1st NOTE and the 1st DOT to the Morgan Stanley Trust, therefore the assignment is void ab initio, and Deutsche is not the beneficiary of record entitled to initiate foreclosure proceedings, by itself or through its "agent for beneficiary" — ReconTrust.

**48.   THE ASSIGNMENT OF DEED OF TRUST RECORDED ON 6/28/11 CANNOT ASSIGN ANY INTEREST TO THE MORGAN STANLEY TRUST, ON BEHALF OF THE ORIGINAL LENDER ACCREDITED, BECAUSE ACCREDITED IS LIQUIDATED AND THE PERMISSION OF THE BANKRUPTCY TRUSTEE AND COURT IS REQUIRED FOR MERS TO ACT. SAID PERMISSION WAS NOT OBTAINED, THEREFORE THE 1ST DOT AND 1ST NOTE CANNOT BE ASSIGNED T OTHE PURPORTED BENEFICIARY, THE MORGAN STANLEY TRUST, AND THE ASSIGNMENT IS VOID AB INITIO.**

Because the Assignment of the Deed of Trust is void ab initio, the Notice of Default is also void ab initio, thus current status of the 1st Deed of Trust is that stated on the original 1st Deed of Trust recorded on 9/18/06, specifically that the Trustee is still Alliance Title and the beneficiary is still Accredited Home Loans. The 1st Deed of TRUST state only that MERS is the beneficiary and the nominee of the Lender. Therefore, only the beneficiary Accredited or its agent can initiate a foreclosure, and Accredited, a bankrupt, cannot do so, without the permission to the Bankruptcy Trustee and the Bankruptcy Court. If the 1st Note is not part of the Morgan Stanley Trust as of 6/28/11 and if MERS is in fact, the "holder" then it must be acting as the "nominee" or "beneficiary" of Accredited. In fact, the seller Accredited is now liquidated as set forth in paragraph 4 Incorporated by reference. Therefore, in order for MERS to execute any assignment "as nominee for the "Seller", i.e. Accredited, MERS would need the permission of the trustee for Accredited's bankruptcy to obtain authority to executed said assignment. The plaintiff has had the bankruptcy docket reviewed regarding Accreditor's bankruptcy and there is no indication that the trustee has approved this assignment. The plaintiff is informed and believes and thereon alleges that such authority is unlikely to be given in most situations. Perhaps most compellingly, where the original and true note holder Accredited has gone bankrupt and is now in liquidation, the trustee or receiver is unlikely to permit an assignment to another entity.

For the foregoing reasons, the assignment is null and void ab initio and Deutsche is not the beneficiary of record entitled to initiate foreclosure proceedings, by itself or through its "agent for beneficiary" — Recontrust.

**49.    THE ASSIGNMENT OF DEED OF TRUST RECORDED ON 6/28/11 IS VOID BECAUSE THERE IS A FACTUAL BASIS TO SUSPECT THAT THE 1ST NOTE WAS NOT, IN FACT, TRANSFERRED BY ACCREDITED INTO THE MORGAN STANLEY TRUST. THEREFORE THERE CAN BE NO ASSIGNMENT BY SAID INSTRUMENT OF THE 1ST DOT AND 1ST NOTE TO THE PURPORTED**

**BENEFICIARY, THE MORGAN STANLEY TRUST, THUS THE ASSIGNMENT IS VOID AB INITIO.**

The plaintiff is informed and believes and thereon alleges, that there is a factual basis to suspect, based upon the face of the Assignment of Deed of Trust and the PSA that the 1st Note was not, in fact, transferred by Accredited into the Morgan Stanley Trust, the purported beneficiary, at all because if it were, Deutsche as Trustee for the Morgan Stanley Trust would be the "holder" of the 1st Note — not MERS which signed the Assignment of the Deed of Trust as the "holder' of the Deed of Trust AND "together with the "note". If MERS is still the "holder", it did not transfer the Note into the Morgan Stanley Trust and the trust is not the beneficiary. If MERS is still the "holder", the Seller did not transfer the Deed of Trust to the Custodian Deutsche by designating MERS as the mortgagee of record, as the "mortgagee of record, as nominee for the Seller" on the MERS System, pursuant to the PSA's definition of a "MERS Designated Mortgage Loan". Therefore, pursuant to the terms of the PSA, Morgan Stanley Trust did not become the "holder" of the Note and Deed of Trust as of the Closing Date April 3, 2007 and it now has, in fact, no authority whatsoever as a "beneficiary" to initiate foreclosure proceedings through its agent Recontrust. New York trust law provides that if the trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust, except as authorized . . . is void. Because the governing document in these securitizations -- the PSA -- both creates the securitization trust and purports to sell the loans into the trust, the conditions of such sale set forth in the PSA must be carefully adhered to and not be subject to any variance or exception outside the four corners of the contract. If those terms and conditions are not properly followed, the sale may be void. In such an event, the securitization would not own the loan it supposedly owns as a result of the securitization transaction.

For the foregoing reasons, the assignment is null and void ab initio and Deutsche is not the beneficiary of record entitled to initiate foreclosure proceedings, by itself or through its "agent for beneficiary" — Recontrust.

**50.   THE ASSIGNMENT OF DEED OF TRUST RECORDED ON 6/28/11 DOES NOT MEET THE REQUIREMENTS OF THE CALIFORNIA AND NEW YORK STATE UNIFORM COMMERICAL CODES IN REGARDING TO MERS BEING A PURPORTED "HOLDER" OF THE 1ST NOTE. THEREFORE SAID ASSIGNMENT OF DEED OF TURST DOES NOT ASSIGN THE 1ST DOT AND 1ST NOTE TO THE PURIPORTED BENEFICIARY, THE MORGAN STANLEY TRUST. THUS THE ASSIGNMENT IS VOID AB INITIO.**

MERS cannot be a "holder" as of the date of the Assignment of the Deed of Trust executed by MER's agent on 6/28/11, under California Commercial Code §1201, if the 1st Note was transferred to the Morgan Stanley Trust at the Closing Date of April 3, 2007, because §1201 defines a "holder" as a person in possession of the Note payable to a bearer or to itself. CC Section 1201 states: "Holder" means: (A) the person in possession of a negotiable instrument that is payable either to bearer or, to an identified person that is the person in possession; or (B) the person possession of a document of title if the goods are deliverable either to bearer or to the order of the person in possession.

**51.   RECONTRUST AS "AGENT FOR THE BENEFICIARY" MORGAN STANLEY TRUST HAS NO AUTHORITHY TO ACT ON BEHALF OF MORGAN STANLEY IF THE ASSGINEMENT BY MERS OF THE 1st NOTE AND 1st DOT TO THE MORGAN STANLEY TRUST IS VOID AB INITI0.**

The plaintiff alleges that because MERS had, in fact, no authority whatsoever as the "holder" to assign any beneficial interest to Deutsche in the Assignment of the Deed of Trust,

Recontrust, which imitated the foreclosure proceeding as the "agent for the beneficiary" Deutsche by recording its Notice of Default and Election to Sell under Deed of Trust recorded on 9/21/1 l, as set forth herein and attached as, Exhibit H, had, in fact, no authority whatsoever to do so, because the beneficiary at the time the Notice of Default was recorded, was actually, in fact, g Deutsche, because the assignment of beneficial interest to Deutsche was void ab initio.

**52.     THE SECOND CHANGE OF LOAN SERVICER — TO BANK OF AMERICA CORP.**

On or about September 2009, the plaintiff is informed and believes and thereon alleges that Countrywide and/or Bank of America Corp. through one of its subsidiaries, possibly BAC, represented to the plaintiff that she was to make monthly payments for the 1st Loan and 2nd Loan to Bank of America, and not to Countrywide, and she commenced to make timely and fully monthly payments to Bank of America Corp. The plaintiff is informed and believes and thereon alleges that Bank of America was the servicer of the plaintiffs two Loans, although neither Countrywide nor Bank of America Corp explained to her that Bank of America Corp did not have any beneficial interest in the loan and was not the lender. Therefore, the plaintiff believed that Bank of America Corp had become the lender in the place of Accredited. Plaintiff is informed and believes and thereon alleges that Bank of America Corp became the successor servicer under the PSA to the former servicer Countrywide, when Bank of America Corp purchases Countrywide as set forth herein.

**53.     FAILURE TO MAKE TIMELY PAYMENTS.**

On or about January 2009, the plaintiff failed to make timely full payments on the 1st Loan and 2nd Loan because the interest rates were exorbitant and it was impossible for her to do so.

54.   **BANK OF AMERICA CORP'S REPRESENTATIONS REGARDING THREE MODIFICATIONS OF THE 1st LOAN.**

The plaintiff alleges that Bank of America Corp. agreed to modify her 1st loan and postpone any foreclosure until the modification occurred on three occasions.

A.   First Attempted Modification. In 2009 Bank of America Corp. represented to the plaintiff that she could try to modify the 1st Loan through Bank of America Corp.'s home loan retention program. The plaintiff submitted all documentation that Bank of America Corp. required to obtain the modification on or about September 2009 and the plaintiff paid pursuant to the modification on or about October 9, 2009 and on November 9, 2009, the sums of $2,217.43. The plaintiff signed and notarized the loan modification agreement with Bank of America Corp. and sent proof of her income by 3 months of bank statements to Bank of America., which it had requested. Later, Bank of America denied having received the plaintiff's proof of income and cancelled the modification.

B.   Second Attempted Modification. On or January 2010, Bank of America Corp. again agreed in writing to modify the first loan under its Bank of America home loan retention program. The plaintiff paid pursuant to this modification on or about February 4, 2010 the sum of $2,669.17 and on or about March 4, 2010, the sum of $2074.14. Thereafter, Bank of America Corp. cancelled the modification without giving any reason. As part of their negotiations of a workout agreement regarding the Loan, Bank of America had requested the aforesaid monthly payments as a demonstration of good faith and as part of a so-called "trial modification" Plaintiff agreed to make such payments and made them with the understanding that Bank of America Corp. would not conduct] a trustee sale of the Subject Property while the negotiations were under way and would offer her work-out agreement of the Loan that would allow her to retain the Subject Property under more reasonable terms in light of its significantly reduced fair market value in order to finalize the modification. The plaintiff made the aforesaid payments on time

1    pursuant to the modification, yet Bank of America cancelled the first two modifications. The

2    plaintiff made numerous inquiries to Bank of America which did not respond to her inquiries.

3        C.    Third Attempted Modification. On or about April 2010, the Bank of America

4    Corp. again agreed to modify the 1st loan and postpone any attempted foreclosure, and the

5    plaintiff supplied additional information to the a Bank of America Corp executive which he

6    requested in order to modify the loan. The plaintiff believed the loan was undergoing

7    modification up until the date she received the Notice of Default from Recontrust.

8        D.    Failure to Modify the 1st Loan on three occasions. Therefore, Bank of America

9    Corp. represented to the plaintiff three times that it would modify the 1st Loan by utilizing its

10   home loan retention program and that it would postpone any foreclosure while it so modified the

11   loan, and it failed to so modify and instead initiated foreclosure proceedings.

12       E.    **DEFENDANT BANK OF AMERICA CORP'S LACK OF AUTHORITY**

13   **TO ENGAGE IN MODIFICATION.**

14       The plaintiff is informed and believes and thereon alleges that Bank of America Corp.'s

15   Home Loan Retention Program is utilized for loans originated by Bank of America exclusively.

16   The plaintiff is informed and believes and thereon alleges that the Morgan Stanley Trust did not

17   and does not participate in the Bank of America Home Loan Retention Program. In addition,

18   according to the PSA, the servicer Bank of America had the sole duty to "maximize interest

19   payments and profits". Therefore it could not modify the 1st loan consistent with the terms of the

20   PSA because it would be unprofitable to the Morgan Stanley Trust to do so. Therefore, the

21   plaintiff alleges that Bank of America Corp. had zero authority to modify the 1st loan under Bank

22   of America's home loan retention program and/or in accordance with the PSA, yet it engaged in

23   three modifications and represented to the plaintiff that it was modifying the loan on three

24   occasions, and then apparently cancelled the modifications because it had no authority to modify,

25

1   thus deceiving her. At the time, the plaintiff believed Bank of America's representations that it

2   was engaged in said three modifications in good faith.

3        F.      The Plaintiff's reliance on modification to her detriment. Plaintiff forwent seeking

4   other remedies in reliance on the Defendants' promises. If Bank of America Corp. had not

5   falsely purported to engage in a loan modification process, Plaintiff would have focused her time

6   on seeking alternatives to foreclosure other than loan modification, such as bankruptcy

7   proceedings.

8        55.     **THE NOTICE OF DEFAULT.** Nevertheless, despite the fact that the plaintiff

9   believed Bank of America Corp. was still engaged in modifying her 1st loan, unbeknownst to

10  Plaintiff, on September 21, 2011, ReconTrust Company as "agent for the beneficiary" recorded a

11  Notice of Default and Election to Sell Under Deed of Trust pertaining to the 1st loan, in Alameda

12  County Recorder's office, Doc. No. 2011268436, (hereinafter "NOD") attached hereto as Exhibit

13  H and incorporated herein by reference. Said NOD states:

14          NOTICE IS HEREY GIVEN THAT: RECONTRUST COMPANY, N.A. is acting as an
            agent for the Beneficiary under a Deed of Trust dated 9/ 1/06 executed by Rahila Kahn, a
15          married woman as her sole and separate property as Trustor, to secure certain obligation
            in favor of MERS as beneficiary recorded 9/18/06 as Instrument No. 200635 1 807."
16

17  Said Notice of Default also states:

18          To find out the amount you must pay or to arrange for payment to stop the foreclosure, or
            if your property is in foreclosure for any other reason, contact: Deutsche Bank National
19          Trust Company, as trustee for the holders of the Morgan Stanley Home Equity Loan
            Trust 2007-2, Mortgage Pass Through Certificates, Series 2007-2 C/O Bank of America,
20          N.A. 400 National Way, Simi Valley, CA 93065, Foreclosure Department (800) 669-
            6650.
21

22

23          Therefore, Recontrust, who recorded the Notice of Default recorded on 9/21/11, has

24  stated in the Notice of Default that MERS is the beneficiary in the Notice of Default. In

25  contradiction, MERS itself states in the "Assignment of Deed of Trust recorded on 6/28/11 that it

has transferred under the Deed of Trust to Deutsche Bank National Trust Company, as trustee for the holders all beneficial interest of the Morgan Stanley Home Equity Loan Trust 2007-2, Mortgage Pass Through Certificates, Series 2007-2.

In addition, in its Debt Validation Notice, which Recontrust sent to the plaintiff on or about October 1, 2011, Recontrust states herein, "The name of the Creditor to whom the debt is owed:

**"Bank of America, N.A."**

56. **THE 2923.5 DECLARATION.** Attached to said Notice of Default (Exhibit H) is a "California Declaration" by Chamkiri Miller, Mortgage Servicing Specialist II of Bank of America, N.A. Ms. Miller and declared that the requirements of Section 2923.5 of the California Civil Code had been met, by specifically stating that she "tried with due diligence to contact the borrower in accordance with California Civil Code Section 2923.5." Her "Declaration" signed 9/13/11 was not under penalty of perjury. In fact the plaintiff never was contacted by Chamkiri Miller even though she was available via telephone, mail and email. Moreover, the declaration is void because it fails to comply with CC §2923.5. A true and correct copy of the Notice of Default with the Default Declaration attached is attached hereto as Exhibit K and is incorporated herein by reference.

In fact, Ms. Miller did not initiate any attempt to try to contact the plaintiff regarding foreclosure options, in order to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure." The plaintiff never heard from her.

57. **NO SUBSTITUTION OF TRUSTEE WAS EVER FILED REGARDING THE 1st DOT.**

The plaintiff has had the Alameda County Recorders index searched and has determined as of the date of the filing of this complaint no Substitution of Trustee was ever filed by anyone regarding the 1st Dot.

**58.    DECLARATORY RELIEF IS SOUGHT REGARDING THE LACK OF ANY RECORDATION OF A SUBSTITUTION OF TRUSTEE AND THE REQUIREMENT THAT ANY FUTURE NOTICE OF SALE BE RECORDED ONLY LFTQ RECORDING A VALID SUBSITUTION OF TRUSTEE.**

The Notice of Default was executed by Recontrust as the "agent for the beneficiary", Deutsche as Trustee for the Morgan Stanley Trust. ReconTrust was not the trustee named in the deed of trust — Alliance Title was. No substitution of trustee was ever recorded regarding the 1st DOT, as set forth herein and incorporated by reference.) Although the plaintiff contends that the Assignment of Deed of Trust to the "beneficiary was void ab initio as set forth herein, even if the assignment is found to be legal, and although the agent of a beneficiary can institute non-foreclosure proceedings pursuant to California Civil Code § 2924(b)(4), the 1st DOT, states herein, the requirement that a Trustee, not a beneficiary, must file the Notice of Sale and conduct any sale.

**Paragraph 22 Acceleration;** Remedies states in relevant part:

> If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default an of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is sold. . . . . Trustee shall give public notice of sale to the person and in the manner prescribed by Applicable law. After the time required by Applicable law, Trustee, without demand on Borrow shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. . .. Trustee shall deliver to the purchase Trustee's deed conveying the property without any covenant or warranty, express or implied.  Therefore according to the 1st DOT, although the Lender or its agent can record a Notice of Default, only the Trustee can give "public notice of sale" and "sell the property at public auction"

Thus, the 1st DOT does not allow the Lender or its agent to record the Notice of Sale and conduct the sale — only a Trustee can do so. Paragraph 24 of the 1st DOT governs the manner of Substitution of Trustee:

Substitute Trustee. Lender, at its option, may from time to time appoint a successor

trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by the

Lender and recorded in the office of the Recorder of the county in which the Property is

located. The instrument shall contain the name of the original Lender, Trustee, and Borrower, the

book and page where this Security Instrument is recorded in the name and address of the

successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all

the title, powers and duties conferred upon the Trustee herein and by Applicable Las. This

procedure for substitution of trustee shall govern to the exclusion of all other provisions for

substitution must recorded prior to the actual sale.  Pursuant to Civil Code section 2934a (c) a

substitution of trustee can be recorded after the notice of' default is recorded, however, if that

occurs, a "new notice of sale" must be given pursuant to 2934a (e), to wit:

> (e) Notwithstanding any provision of this section or any provision
> in any deed of trust, unless a new notice of sale containing the
> name, street address, and telephone number of the substituted trustee
> is given pursuant to Section 2924f, any sale conducted by the
> substituted trustee shall be void.

Therefore, the plaintiff seeks declaratory relief — a declaration that the purported

beneficiary the Morgan Stanley Trust or Deutsche as Trustee for the Morgan Stanley Trust and

its agents Bank of America Corp. and Recontrust and any other agents have no right to record a

give any Notice of Sale and/or conduct any foreclosure proceeding without first filing a valid

Substitution of Trustee and then giving a Q Notice of Sale.

**59. THE PATENT REPRESENTATIONS ON THE FACE OF THE LOAN**

**DOCUMENTS AND OTHER FACTS SHOW THAT THE 1ST PROMISSORY NOTE**

**WAS NOT TRANSFERRED TO THE TRUST, PURSUANT TO THE PSA AND NEW**

**YORK LAW THEREFORE THERE IS NO RIGHT TO FORECLOSE.**

Without a lawful transfer of the 1st Note to the Morgan Stanley Trust, pursuant to New

York Law and the PSA, the Morgan Stanley Trust, which did not possess the 1st Note at the time

of the Closing Date plus ninety days thereafter, cannot foreclose on the Subject Property. The plaintiff alleges that the 1st Note may not have been duly endorsed, transferred and delivered to the Morgan Stanley Trust as required by the PSA.  Plaintiff further alleges that in order for the Morgan Stanley Trust to have had a valid and enforceable security interest against the Subject Property, the Morgan Stanley Trust must prove that it received an endorsement of the Note prior to the Closing Date of the Morgan Stanley Trust and that it had physical possession of the Note at the time of the foreclosure. Absent such proof that the 1st Note was lawfully and timely transferred to the trust, Plaintiff alleges that the Morgan Stanley Trust and its agents Bank America Corp. and ReconTrust have no authority whatsoever to foreclose on the Subject Property.

**60. THE PATENT REPRESENTATIONS ON THE FACE OF THE DOCUMENTS AND OTHER FACTS SHOW THE 1" DEED OF TRUST WAS NOT ASSIGNED TO THE MORGAN STANLEY TRUST, PURSUANT TO THE PSA AND NEW YORK LAW. THEREFORE THERE IS NO RIGHT TO FORECLOSE.**

Without a lawful assignment of the 1st Deed of Trust to the Morgan Stanley Trust, pursuant to New York Law and the PSA, the Morgan Stanley Trust, which did not possess the 1st DOT, as of the Closing Date plus ninety days thereafter, cannot foreclose on the Subject Property. The plaintiff alleges that the 1st DOT may not have been duly transferred to the Morgan Stanley Trust as required by the PSA. Absent such proof that the 1st Note was lawfully and timely transferred to the trust, Plaintiff alleges that the Morgan Stanley Trust and its agents Bank America Corp. and ReconTrust have no authority whatsoever to foreclose on the Subject Property.

**FIRST CAUSE OF ACTION FOR FRAUD AGAINST BANK OF AMERICA N.A.**

61.    Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through 60, inclusive, as though fully set forth herein.

62.    On or about September 2006, Plaintiff engaged the services of Golden State and the entities to which it "converted out" (hereinafter "DOES 6 through 10") by engaging the services of a male mortgage broker Thomas, whose last name the plaintiff cannot now recall (hereinafter DOE 1) and a female employee of Golden State named Mary, whose last name the plaintiff cannot now recall (hereinafter DOE 2) and a male supervisor whose name the plaintiff cannot now recall (hereinafter DOE 3) and possibly engaged the services of other persons employed by Golden State and Does 6 through 10, whose identities the plaintiff does not recall or know at this time, (hereinafter DOES 4 through 5).  Mary, DOE 2, acted at all times material to this Complaint, in the role of an assistant to DOE 1 AND DOE 3. DOES 1 through 5 held themselves out to be agents and employees of Golden State and plaintiff is informed and believes and thereon alleges that they worked for Golden State. Plaintiff employed the services of said defendants Golden State DOES 1 through 10 to procure a loan for her to purchase the Subject Property. The plaintiff's primary language is Urdu. The plaintiff at the time she procured said 1st Loan and 2nd Loan had limited English language ability regarding reading, and could not read and understand the terms used in reference to loans and financing. The plaintiff could not read the and understand the terms in English regarding said 1st Loan and 2nd Loan as set forth in the stack of loan documents which Does 1 through 3 told her to sign in order to procure said loans.  The plaintiff told Does 1 through 3 that her primary language was Urdu and that she could not read said loan documents, but they failed to provide for her any translation whatsoever. Instead, Doe 3 made representations about the 1st Loan and 2nd Loan to the plaintiff as set forth in paragraphs 28 through 36, incorporated by reference and told her that said loan documents

stated what he represented to her as set forth in said paragraphs. The plaintiff believed Doe 3 and relied upon him completely.

63.     On the day the plaintiff signed the loan documents at Golden State's office in Fremont, California, the plaintiff could not read the loan documents which contained sophisticated and complex loan and finance terms because of her limited English language reading ability and needed to have all of the loan documents translated into Urdu for her so she could understand them. However, DOE 3, speaking English, represented to the plaintiff what was in the loan documents and she believed what he said to her because of his apparent professional expertise.

64.     On the day the plaintiff signed the loan documents at Golden State's office in Fremont, DOES 1 through 3 did not translate into Urdu any of what Doe 3 represented to the plaintiff in his oral statements regarding the two loans, nor did they translate into Urdu any of the documents regarding the 1st Loan and 2nd Loan which she signed..

65.     Accordingly, as a result of Bank of America's fraudulent conduct, Plaintiff has suffered, and will continue to suffer, compensatory, general and special damages in an amount to proof.  Additionally, Bank of America acted with malice, fraud and/or oppression and, thus, Plaintiffs is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION FOR VIOLATIONS OF TRUTH IN LENDING ACT AGAINST BANK OF AMERICA N.A.

66.     Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through 64, inclusive, as though fully set forth herein.  The claims are against Defendants BANK OF AMERICA N.A. and RECONTRUST COMPANY.

67.     Because the transaction was secured by Plaintiffs home, and was not entered into for the purposes of the initial acquisition or construction of that home, it is subject to the right to

cancel provided by TILA, 15 U.S.C. $ 1601, and implementing Federal Reserve Board

Regulation Z, 12 C.F.R $ 226.23, which provides:

(a) Consumers right to rescind

(1)     In a credit transaction in which a security interest is or will be retained or acquired in a consumers principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section. [fn]47.

(2)     To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram, or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditors' designated place of business.

(3)     The consumer my exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of al material disclosures, [fn] 48, whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. $ 1635(f)].

(4)     When more than one consumer in a transaction has the right to rescind the exercise of the right by one consumer shall be effective as to all consumers.

(b) Notice of right to rescind

In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1)     The retention or acquisition of a security interest in the consumers' principal dwelling.

(2)     The consumers' right to rescind the transaction;

(3)     How to exercise the right to rescind, with a form for that purpose, designating the

address of the creditors place of business;

(4)     The effects of rescission, as described in paragraph (d) of this section;

(5)     The date the rescission period expires;

(f) <u>Exempt transactions.</u>

The right to rescind does not apply to the following:

(1)     A residential mortgage transaction defined in U.S.C. 15 $1602(w) as one where a "security interest is created or retained against the consumers dwelling to finance the acquisition or initial construction of such dwelling].

(2)     A credit plan in which a state agency is a creditor.

36.     Because Defendants Bank of America, N.A. and Recontrust Company failed to comply with Section 226.23, Plaintiffs has a continuing right to rescind.

37.     Plaintiffs have given notice of their election to rescind.

**ADDITIONAL RELIEF:**

In any transaction in which it is determined that the creditor has violated this section, in addition to rescission, the Court may award relief under section 1640 of this title for violations of this sub-chapter not relating to the right to rescind.

WHEREFORE, Plaintiffs requests that the Court enter judgment in favor of Plaintiffs and against Bank of America, N.A. and Recontrust Company for:

1.     Rescission of the Golden State Funding loan;

2.     Statutory damages for the disclosure violations;

3.     Attorneys fees, litigation expenses and costs.

4.     Such other relief as the Court may deem just and proper.

**THIRD CAUSE OF ACTION FOR VIOLATIONS IN REAL SETTLEMENT**

**PROCEDURES ACT AGAINST BANK OF AMERICA N.A.**

68.     Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through 67, inclusive, as though fully set forth herein.  The claims are against Defendants BANK OF AMERICA N.A. and RECONTRUST COMPANY.

69.     By engaging in the practices set forth above, Defendants BANK OF AMERICA N.A. and RECONTRUST COMPANY gave to, and/or accepted a fee, kickback, or thing of value pursuant to an agreement or understanding that business incident to or a part of a real estate settlement service involving federally related mortgage loans would be referred to a person in violation of the Real Estate Settlement Procedures Act of 1974, 12 11 U.S.C. $ 2607(a).

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

**FOURTH CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA CIVIL CODE SECTIONS 2923.5 AND 2924 AGAINST BANK OF AMERICA N.A.**

70.     Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through 39, inclusive, as though fully set forth herein

71.     Defendants BANK OF AMERICA caused to record a materially defective Notice of Default and Election to sell under the Deed of Trust on _____ _____, 20___, Document No. _____-_____.

72.     As Trustee or agent of the beneficiary BANK OF AMERICA, breached the duty to follow California Statutes § 2923.5 and § 2924 causing a direct and proximate cause of damages to Plaintiff and voids the Notice of Default.

**VIOLATION OF CC§2923.5 A REQUIREMENT PRIOR TO FILING A NOD CC§2924**

73.     The Defendants BANK OF AMERICA N.A. and RECONTRUST COMPANY, unfair, unlawful, and fraudulent business practices including, but not limited to the patently false and misleading declaration by BANK OF AMERICA N.A. and the errors in filing the NOD on _____ ____, 20____ in violation to § 2923.5 and § 2924.

74.     BANK OF AMERICA knowingly attached such declaration, (negligently, and when confronted chose to ignore this fact demonstrating malice), to the faulty Notice of Default filed _____ and in violation of statutes § 2923.5 and § 2924.

75.     BANK OF AMERICA N.A. and RECONTRUST COMPANY knew that this was not to be sent, both knew it was not accurate, both knew it was done contrary to Cal. Civ. Code § 2923.5.  The legislature enacted this statute to slow the foreclose process and protect homeowners.

76.     In a rush to mass produce Declaration Notices, to put people out of their homes BANK OF AMERICA N.A. and RECONTRUST COMPANY harmed Plaintiff and harmed many other who just gave up.

77.     Both made more money by rapidly pushing people out of their homes this done aggressively with negligence and when confronted chose to ignore and push harder to eject Plaintiff and other homeowners.  This is negligence with malice.  They lost money if modifications were done.

This was presented to Congress as an interim report:

*"Current extremely high levels of defaults and foreclosures among residential mortgages represents the interim report to Congress by the Secretary of the Department of Housing and Urban Development (HUD) pursuant to Section 1517 of the Housing and Economic Recovery Act (HERA) of 2008 (P.L. 110-289)".*