1

2

3

4

5

6

7

8        UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA

10              San Francisco Division

11

12   RAHILA A KHAN,                            Case No. 3:12-cv-01107-LB
                    Plaintiff,
13                                             **ORDER GRANTING DEFENDANT'S
            v.                                 MOTION FOR SUMMARY JUDGMENT**
14
     BANK OF AMERICA, N.A., et al.,            [Re: ECF No. 152]
15
                    Defendants.
16

17                                             **INTRODUCTION**

18        Rahila Khan, who is proceeding pro se, sued Bank of America, N.A. ("Bank of America"),

19   ReconTrust Company ("ReconTrust"), and Select Portfolio Servicing, Inc. ("SPS") for claims

20   based on her attempts to have her mortgage loans modified and the foreclosure proceedings

21   instituted on her property. (*See* Third Amended Complaint, ECF No. 132.[1]) Bank of America is

22   the only remaining defendant, and it moves for summary judgment with respect to Ms. Khan's

23   only remaining claim. (Motion, ECF No. 152.) The court held a hearing on the motion on June 25,

24   2015. (6/25/2015 Minute Order, ECF No. 163.) For the reasons stated below, the court grants

25   Bank of America's motion.

26

27   _____

28   [1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations are to
     the ECF-generated page numbers at the tops of the documents.

     ORDER (No. 3:12-cv-01107-LB)

**STATEMENT**

Ms. Khan filed this action against ReconTrust and Bank of America on March 6, 2012. After several amended complaints (one of which added SPS as a defendant) and motions to dismiss those amended complaints, Bank of America is the only defendant left, and Mr. Khan's fraud claim against it is the only claim left.[2] (*See* 2/23/2015 Order, ECF No. 109 at 9-11; Third Amended Complaint, ECF No. 132; 4/22/2015 Order, ECF No. 149.) On May 12, 2015, Bank of America filed a motion for summary judgment in its favor on that claim. (Motion, ECF No. 152.) Ms. Khan filed an opposition on June 8, 2015, and Bank of America filed a reply on June 15, 2015. (Opposition, ECF No. 160; Reply, ECF No. 161.) The court held a hearing on the motion on June 25, 2015. (6/25/ 2015 Minute Order, ECF No. 163.)

In the paragraphs below, the court recounts the facts that are supported by authenticated and admissible evidence.

**I. THE LOAN AND MS. KHAN'S DEFAULT**

On September 1, 2006, Ms. Khan obtained a loan for $460,000 from Accredited Home Lenders, Inc. ("Accredited"). (Yurkovich Decl., ECF No. 153 ¶¶ 2-3 & Ex. A; Whittemore Decl., Ex. A ("Khan Depo."), ECF No. 152-3 at 9.) In so doing, she executed an Adjustable Rate Note (the "Note"). (Yurkovich Decl., ECF No. 153 ¶ 3 & Ex. A.) Pursuant to the Note, the interest rate was fixed at 8.40% (resulting in a monthly payment of $3,504.46) through October 1, 2008, but thereafter the interest rate was adjustable. (*Id.* ¶ 3 & Ex. A.)

The Note was secured by a deed of trust ("Deed of Trust") on property located at 39959 Michelle Street, Fremont, California 94538 (the "Michelle Street Property"). (*Id.* ¶ 4 & Ex. B.) In the Deed of Trust, Ms. Khan is named as the "borrower," Accredited is named as the "lender," and Alliance Title is named as the trustee. (*Id.* ¶ 4 & Ex. B.) Hereinafter, the Note and Deed of Trust may be referred to collectively as the "Loan."

When she obtained the Loan, Ms. Khan also executed an Occupancy Agreement in which she

---

[2] For a detailed procedural history of this action, please refer to the court's April 22, 2015 order granting the defendants' motion to dismiss Mr. Khan's Third Amended Complaint. (4/22/2015 Order, ECF No. 149 at 4-5.)

United States District Court
Northern District of California

certified that she: (1) intends to occupy the Michelle Street Property as her primary residence; (2) intends to occupy the Michelle Street Property as her primary residence during the 12-month period immediately following the closing of the Loan; (3) agrees to notify Accredited immediately if her intention regarding her occupancy of the Michelle Street Property changes prior to the closing of the Loan; (4) understands that Accredited may not make the Loan without the Occupancy Agreement; and (5) acknowledges that Accredited has relied upon her representations of occupancy in securing the Loan and the interest rate or funding the Loan. (*Id.* ¶ 5 & Ex. C.) It turns out, however, that the Michelle Street Property is Ms. Khan's rental property. (Khan Depo., ECF No. 152-3 at 5.) Her primary residence actually is her other property, which is located at 40224 Blanchard Street, Fremont, California 94538 (the "Blanchard Street Property"). (*Id.*)

Bank of America began servicing the Loan on February 2, 2007. (Yurkovich Decl., ECF No. 153 ¶ 6.) That year, Ms. Khan suffered economic hardship due to a decline in her childcare business, and as a result she defaulted on the Loan. (Khan Depo., ECF No. 152-3 at 6; Yurkovich Decl., ECF No. 153 ¶ 7 & Ex. D.) Bank of America thereafter sent Ms. Khan a Notice of Intent to Accelerate dated July 21, 2009, which stated that the Loan was in default and that the arrearages totaled $32,542.32 as of that date. (Yurkovich Decl., ECF No. 153 ¶ 7 & Ex. D.)

## II. MS. KHAN'S ATTEMPTS TO MODIFY THE LOAN

By letter dated December 22, 2009, Bank of America's Senior Vice President, Home Retention Division, Jill Balentine, offered Ms. Khan a permanent modification of the Loan. (Khan Depo., ECF No. 152-5 at 8; Yurkovich Decl., ECF No. 153 ¶ 8 & Ex. E.) The letter states that Ms. Khan is "eligible for [Bank of America's] Homeownership Retention Program" and attaches a loan modification agreement (the "2009 Loan Modification Agreement") for Ms. Khan to sign and return. (Yurkovich Decl., ECF No. 153 ¶ 8 & Ex. E.) The letter also states in a footnote that Ms. Khan's eligibility for this program "is based upon information [she] provided to [Bank of America] and may be subject to validation." (*Id.*) As for the terms of the 2009 Loan Modification Agreement, the letter explains as follows:

> The enclosed modification will reduce your interest rate to 5.000%, which will result in a new payment amount of $2,069.17. This rate will be fixed for a period of one year. It will take effect

United States District Court
Northern District of California

United States District Court
Northern District of California

> January 1, 2010 and will continue until December 31, 2010. At the end of one year, your interest rate will increase; however, the interest rate will not increase your total principal (if applicable) and interest payments by more than 7.500% of total scheduled payments of principal (if applicable) and interest from the prior year. Your interest rate will continue to change annually thereafter, subject to a maximum interest rate of 8.000%.
>
> Accepting the enclosed modification also resolves your past due amount of $63,095.20 as of December 15, 2009. . . .

(*Id.* (footnotes omitted).)

The letter also states that, "to accept the enclosed modification," Ms. Khan must: (1) carefully review the 2009 Loan Modification Agreement; (2) "[s]ign and date the enclosed modification document in the presence of a notary"; (3) include "[c]opies of two recent (within the past 60 days) paystubs for each income earner, and/or [c]opies of [her] past three bank statements if: [she is] self-employed, or [if she has] any other sources of income such as government, retirement or disability benefits, child support or alimony payments, rental or boarder income, etc.;" and (4) "[r]eturn the signed documents to [Bank of America] in the pre-paid FedEx envelop no later than January 21, 2010 in order for it to take effect." (*Id.*)

On January 11, 2010, ten days before the signed 2009 Loan Modification Agreement was due, Ms. Khan sent a letter to Ms. Balentine acknowledging receipt of her December 22, 2009 letter and enclosing an application for a loan modification under federal government's Home Affordable Modification Program ("HAMP") ("January 2010 HAMP Application"). (Khan Depo., ECF No. 152-5 at 34-36.) (Ms. Khan also sent a copy of her January 2010 HAMP Application to Bank of America's MHA Escalations Unit on the same day. (Khan Depo., ECF No. 152-6 at 3-5.)) In the letter, Ms. Khan states the she believes she "may be qualified for a HAMP modification on better terms than that of the [2009 Loan Modification Agreement that Bank of America] propose[d]." (Khan Depo., ECF No. 152-5 at 36.) When she sent the January 2010 HAMP Application to Bank of America, Ms. Khan was not aware that HAMP applies only to loans relating to a borrower's primary residence, not rental property. (Khan Depo., ECF No. 152-6 at 1.) Ms. Khan did testify, though, that Ms. Balentine told her at some point that she might qualify for a loan modification under HAMP if she moved into the Michelle Street Property. (Khan Depo., ECF No. 152-6 at 2-3.) There is no evidence that Bank of America accepted the January 2010 HAMP Application, and

it is unclear whether it was ever granted or denied.

Nevertheless, Ms. Khan signed the 2009 Loan Modification Agreement before a notary public on January 20, 2010 (the day before the deadline for Bank of America to receive it). (Khan Depo., ECF No. 152-5 at 13; Yurkovich Decl., ECF No. 153 ¶ 8 & Ex. E.) Although her memory of January 2010 is a little unclear, Ms. Khan testified that she sent the signed and notarized 2009 Loan Modification Agreement back to Bank of America and that she thereafter received letters from Bank of America saying that she needs to submit "this paper" and "that paper." (Khan Depo., ECF No. 152-3 at 7 & ECF No. 152-5 at 13, 24.) She also testified that she "[gave] all the papers" (although she does not say when) and made modified payments for February and March 2010. (Khan Depo., ECF No. 152-3 at 7.)

According to its business records, a Bank of America representative, denoted in Bank of America's computer system as "MTHORPE," called Ms. Khan on February 12, 2010 because Bank of America was still trying to verify Ms. Khan's income. (Yurkovich Decl., ECF No. 153 ¶ 11 & Ex. F.). Bank of America's records state that she could do this by sending, for example, two recent paystubs, social security documents, and, if self-employed, bank statements showing 90 days of activity, her 2007 and 2008 taxes, pension documents, and/or lease agreements with proof of deposits. (*Id.* ¶ 10 & Ex. F.) The representative left a voice mail message for Ms. Khan about Bank of America's verification of her income and then made a note within Bank of America's computer system stating that if Ms. Khan calls she needs to be told that, because she is self-employed, she needs to provide a profit and loss statement and a "lease agreement for rentals" within 48 hours or the "loan modification referral will be declined" because her income cannot be verified. (*Id.* ¶ 11 & Ex. F.)

That same Bank of America employee called Ms. Khan a second time on March 16, 2010. (*Id.* ¶ 12 & Ex. F.) Once again, the employee left a voice mail message for Ms. Khan about Bank of America's verification of her income and then made another note within Bank of America's computer system stating that if Ms. Khan calls she needs to be told that, because she is self-employed, she needs to provide the documents requested within 48 hours or the "loan modification referral will be declined" because her income cannot be verified. (*Id.* ¶ 12 & Ex. F.)

United States District Court
Northern District of California

The Bank of America employee called Ms. Khan a third time on March 24, 2010. (*Id.* ¶ 13 & Ex. F.) Once again, the employee left a voice mail message for Ms. Khan about Bank of America's verification of her income and then made another note within Bank of America's computer system stating that if Ms. Khan calls she needs to be told that, because she is self-employed, she needs to provide the documents requested within 48 hours or the "loan modification referral will be declined" because her income cannot be verified. (*Id.* ¶ 13 & Ex. F.)

On March 29, 2010, a different Bank of America employee made a note within Bank of America's computer system that Bank of America had received via fax a fax cover sheet, a bank statement, and a verification of employment. (*Id.* ¶ 14 & Ex. F.) The note does not state that a lease agreement had been received.

When Ms. Khan tried on March 31, 2010 to make her payment for April 2010, Bank of America did not accept the payment. (Khan Depo., ECF No. 152-3 at 8.) To resolve the situation, Ms. Khan called Bank of America and spoke to employee Sherry Martin. (*Id.*) Ms. Khan testified that Ms. Martin told her that she needs to send Bank of America her 2008 and 2009 "tax papers." (*Id.*)

On April 6, 2010, Bank of America employee "MTHORPE" made a note within Bank of America's computer system stating that the 2009 Loan Modification Agreement was being denied. (Yurkovich Decl., ECF No. 153 ¶ 15 & Ex. F.) It states:

> Declining loan mod. Multiple attempts were made. Unable to contact homeowner to verify income variance. Returning loan to normal servicing. Declined due to non-compliance. Decline letter sent and codes removed.
> *** H/O [homeowner] DID NOT SEND IN RENTAL AGREEMENT FOR POI [proof of income] OF RENTAL INCOME AS REQUESTED IN TIME ALLOWED***

(*Id.* ¶ 15 & Ex. F.) The note indicates that Bank of America sent a letter notifying Ms. Khan of the declination. (*Id.* ¶ 15 & Ex. F.)

Despite this denial, Ms. Khan continued to send documents to Bank of America on April 9, 2010 and May 19, 2010. (*Id.* ¶ 16 & Ex. F.) There is no evidence of a new loan modification agreement, but Ms. Khan signed the 2009 Loan Modification Agreement again on May 20, 2010 and sent it to Bank of America, although it is unclear when she sent it or whether Bank of America

United States District Court
Northern District of California

invited her do so. (Khan Depo., ECF No. 152-5 at 25-31.) As the court described above, the 2009 Loan Modification Agreement was supposed to have been received by Bank of America by January 21, 2010. (*Id.* at 28.)

On June 28, 2010, Ms. Khan sent Bank of America "proof of income for three months." (Whittemore Decl., Ex. G, ECF No. 153-3 at 19.) That same day, she also sent Bank of America a second application for a loan modification under HAMP ("June 2010 HAMP Application"). (Khan Depo., ECF No. 152-6 at 7-12.) On the June 2010 HAMP Application, Ms. Khan stated that the underlying property is the Michelle Street Property, but she also stated that the property was her primary residence and was owner-occupied. (*Id.* at 8.) During her deposition, Ms. Khan testified that this was a mistake and that she meant for the June 2010 HAMP Application to relate to the Blanchard Street Property. (*Id.* at 13.)

The June 2010 HAMP Application requires the borrower to provide the lender with several documents, including copies of the borrower's two most recent pay stubs that show year-to-date earnings, the borrower's most recent quarterly or year-to-date profit and loss statement, and, for a borrower who has rental income, copies of the borrower's most recently filed and signed federal tax return with all schedules and any current lease agreement along with the two most recent bank statements or cancelled rent checks. (*Id.* at 9.) Ms. Khan, however, appears to have attached to the June 2010 HAMP Application only a profit and loss statement covering the period January 2010 through May 2010. (*Id.* at 12, 14.)

Bank of America acknowledged receiving the June 2010 HAMP Application, and its business records dated July 23, 2010 indicate that it sent a letter dated July 17, 2010 or July 19, 2010 to Ms. Khan notifying her that documents were still missing and that she had 30 days to submit them. (*Id.* at 16-18; Yurkovich Decl., ECF No. 153 ¶ 16 & Ex. F.) The records also indicate that Bank of America reviewed Ms. Khan's financial documents and found them to be incomplete. (Yurkovich Decl., ECF No. 153 ¶ 16 & Ex. F.)

According to Bank of America's business records, Bank of America denied the June 2010 HAMP Application because the Michelle Street Property was not owner-occupied and in fact was renter-occupied. (*Id.* ¶ 17 & Ex. F.) Bank of America sent Ms. Khan a letter dated November 1,

1   2010 informing her that her June 2010 HAMP Application had been denied because she does "not

2   live in the [Michelle Street Property] as [her] primary residence." (Whittemore Decl., Ex. H, ECF

3   No. 152-3 at 21; *see also* Yurkovich Decl., ECF No. 153 ¶ 17 & Ex. F.) Bank of America

4   thereafter sent Ms. Khan a second letter, this one dated February 3, 2011, again informing her that

5   her June 2010 HAMP Application had been denied for the same reason cited in the November 1,

6   2010 letter. (Whittemore Decl., Ex. H, ECF No. 152-3 at 22.)

7        After this, it appears that Ms. Khan may have sought another loan modification in March

8   2011. (Yurkovich Decl., ECF No. 153 ¶ 18 & Ex. F.). Bank of America's business records

9   indicate that one of its employees (denoted as "NBKEZHM" within its computer system) called

10  Ms. Khan on March 18, 2011 and left her a voice mail about her request. (*Id.* ¶ 18 & Ex. F.). The

11  notes within Bank of America's computer system state that if Ms. Khan calls, she should be told

12  that she needs to submit a letter of hardship, income verification, and a list of her monthly

13  expenses. (*Id.* ¶ 18 & Ex. F.). That same employee tried to call Ms. Khan again on March 31,

14  2011, but she did not answer the phone. (*Id.* ¶ 18 & Ex. F.). The employee tried to call her again

15  on April 4, 2011 and left a message for her with a third party. (*Id.* ¶ 18 & Ex. F.). The employee

16  finally spoke with Ms. Khan on April 11, 2011. (*Id.* ¶ 18 & Ex. F.). The employee and Ms. Khan

17  "went over all fin DOCS needed for loan MOD," and the employee told Ms. Khan that she could

18  submit the documents by Friday of that week. (*Id.* ¶ 18 & Ex. F.). It does not appear that Ms. Khan

19  did so, and on April 14, 2011, Bank of America denied her request because she "did not return

20  financials." (*Id.* ¶ 18 & Ex. F.).

21       On September 21, 2011, ReconTrust recorded a Notice of Default and Election to Sell under

22  Deed of Trust that states that Ms. Khan owed $151,302.53 on the Loan as of September 20, 2011.

23  (RJN, Ex. C, ECF No. 152-2 at 16-19.[3]) ReconTrust then recorded a Notice of Trustee's Sale on

24  

25  [3] Bank of America asks the court to take judicial notice of the following documents: (1) a Deed of Trust that was recorded with the Alameda County Recorder's Office on September 18, 2006 as Document No. 2006351807; (2) an Assignment of Deed that was that was recorded with the Alameda County Recorder's Office on June 28, 2011 as Document No. 2011183101; (3) a Notice of Default that was recorded with the Alameda County Recorder's Office on September 21, 2011 as Document No. 2011268436; (4) a Notice of Trustee's Sale that was recorded with the Alameda County Recorder's Office on December 27, 2011 as Document No. 2011375533; (5) an Assignment of Deed that was recorded with the Alameda County Recorder's Office on August 17,

December 27, 2011, which set a trustee's sale for January 17, 2012. (RJN, Ex. D, ECF No. 152-2 at 21.) Ultimately, this trustee's sale never occurred, and on July 1, 2013, ReconTrust recorded a Notice of Rescission of Declaration of Default and Demand for Sale and of Notice of Default and Election to Sell. (RJN, ECF No. Ex. G, ECF No. 152-2 at 28.) Presumably, this is because on May 20, 2013, Bank of American and Ms. Khan agreed to permanently modify the Loan. (Khan Depo., ECF No. 152-6 at 22-35; Yurkovich Decl., ECF No. 153 ¶ 21 & Ex. I.)

## ANALYSIS

### I. LEGAL STANDARD

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." N*issan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070,

---

2012 as Document No. 2012271539; (6) a Substitution of Trustee that was recorded with the Alameda County Recorder's Office on September 24, 2012 as Document No. 2012311867; and (7) a Notice of Rescission that was recorded with the Alameda County Recorder's Office on July 1, 2013 as Document No. 2013227770. (RJN, ECF No. 152-1.) The court may take judicial notice of matters of public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). Because the documents listed above are public records, the court may take judicial notice of the undisputed facts contained in them. *See Hotel Employees & Rest. Employees Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972, 978 (N.D. Cal. 2005); Fed. R. Evid. 201(b); *see also Fontenot v. Wells Fargo Bank, N.A.*, 198 Cal. App. 4th 256, 264-67 (2011).  The court does so now.

1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, then the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co.*, Ltd., 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. APPLICATION

### A.  A Note Regarding Ms. Khan's Opposition

Ms. Khan's opposition really is a declaration that contains an opposition within it. In the first paragraph of her declaration, she states that she has personal knowledge of the facts set forth in it. (Opposition, ECF No. 160 at 1.) The second paragraph, however, goes on for 13 pages. In those 13 pages, Ms. Khan largely repeats the factual allegations she made in her Third Amended Complaint, and many of those factual assertions concern claims that the court dismissed already. (*Id.* at 2-5.) Also within those 13 pages is a "procedural history" section, a "legal standard" section setting forth the summary judgment standard under California (not federal) law, a "points and authorities" section that makes various arguments in opposition to Bank of America's motion, and a "conclusion" section. (*Id.* at 2-14.) After that, the numbered paragraphs begin again. In the third through twenty-third paragraphs of her declaration, Ms. Khan makes various factual assertions and evidentiary objections. (*Id.* at 15-20.) In those paragraphs, Ms. Khan frequently cites to exhibits as evidence for her factual assertions, but the exhibits attached to her declaration are not the ones described in the declaration. For example, she says that Exhibit B is a letter dated April 19, 2015

1    that she sent to Bank of America's counsel, but Exhibit B actually is a copy of the 2009 Loan

2    Modification Agreement that she signed on May 20, 2010. (*Compare* ECF No. 160 at 15 *with* ECF

3    No. 161-1 at 11-24.) The other exhibits are similarly problematic. None of the other exhibits she

4    refers to in her declaration match the exhibits actually appended to her declaration.

5    **B.  The Parties' Evidentiary Objections**

6        Before the court addresses the merits of Bank of America's motion for summary judgment, it

7    first addresses the parties' various objections to each other's evidence.

8        The Ninth Circuit has explained the authentication requirements at the summary judgment

9    stage:

10           A trial court can only consider admissible evidence in ruling on a motion for
     summary judgment. *See* Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*,
11   854 F.2d 1179, 1181 (9th Cir. 1988). Authentication is a "condition precedent to
     admissibility," and this condition is satisfied by "evidence sufficient to support a
12   finding that the matter in question is what its proponent claims." Fed. R. Evid.
     901(a). We have repeatedly held that unauthenticated documents cannot be
13   considered in a motion for summary judgment. *See Cristobal v. Siegel*, 26 F.3d
     1488, 1494 (9th Cir. 1994); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*,
14   896 F.2d 1542, 1550–51 (9th Cir. 1989); *Beyene*, 854 F.2d at 1182; *Canada v.
     Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987); *Hamilton v. Keystone
15   Tankship Corp.*, 539 F.2d 684, 686 (9th Cir. 1976).

16           In a summary judgment motion, documents authenticated through personal
     knowledge must be "attached to an affidavit that meets the requirements of [Fed. R.
17   Civ. P.] 56(e) and the affiant must be a person through whom the exhibits could be
     admitted into evidence." *Canada*, 831 F.2d at 925 (citation omitted). However, a
18   proper foundation need not be established through personal knowledge but can rest
     on any manner permitted by Federal Rule of Evidence 901(b) or 902. *See* Fed. R.
19   Evid. 901(b)(providing ten approaches to authentication); Fed. R. Evid. 902 (self-
     authenticating documents need no extrinsic foundation).

20

21   *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-74 (9th Cir. 2002) (footnotes omitted); *see Las

22   Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532-33 (9th Cir. 2011) (following *Orr*).

23       Bank of America objects to the entirety of Ms. Khan's declaration. It argues that Ms. Khan's

24   declaration should be stricken in its entirety because, while she signed it, she did not sign it under

25   penalty of perjury. Rule 56(c) says that a party may use an affidavit or a declaration to support or

26   oppose a motion for summary judgment, but 28 U.S.C. § 1746 says that declarations may be

27   substituted for affidavits but only if those declarations are made under penalty of perjury. Ms.

28   Khan's declaration is not signed under penalty of perjury and thus is not evidence that the court

1   can consider when ruling on Bank of America's motion for summary judgment. *Tearfie v.*

2   *Whittlesea Blue Cab Co.*, No. 98-16377, 1999 WL 278100, at *1 n. 4 (9th Cir. Apr. 12, 1999)

3   (declining to consider affidavit not made under penalty of perjury); *Davenport v. Bd. of Trs. of*

4   *State Ctr. Comm. College Dist.*, 654 F. Supp. 2d 1073, 1084 (E.D. Cal. 2009) (finding that an

5   unsworn declaration that was not signed under penalty of perjury was "not valid evidence for the

6   purposes of deciding the Defendant's motion for summary judgment on the merits"). Accordingly,

7   the court sustains Bank of America's objection and does not consider the unsupported factual

8   assertions in Ms. Khan's declaration. To the extent that her declaration simply makes arguments in

9   opposition to Bank of America's motion, the court can and does consider those arguments,

10  however.

11      Ms. Khan makes two evidentiary objections. First, she challenges the admissibility of the

12  Yurkovich Declaration. (Opposition, ECF No. 160 at 16.) Ms. Yurkovich is the Assistant Vice

13  President, Operations Team Manager for Bank of America. (Yurkovich Decl., ECF No. 153 ¶ 1.)

14  Bank of America submitted her declaration in support of its motion. In it, she testified about Bank

15  of America's business record-keeping practices generally and about Bank of America's business

16  records relating to Ms. Khan's Loan specifically. (*Id.* ¶¶ 2-21.) She attached the business records

17  relating to Ms. Khan's Loan to her declaration. (*Id.*, Exs. A-I.) She signed her declaration under

18  penalty of perjury. (*Id.* at 7.) In short, Ms. Yurkovich's declaration appears to be in good order.

19      Ms. Khan argues that Ms. Yurkovich's testimony should be rejected because Ms. Yurkovich

20  "is not one of the [Bank of America] employees or contractors who were involve[d] in the loan

21  modification process from 2008 to 2013." (Opposition, ECF No. 160 at 16.) Instead, Ms.

22  Yurkovich "only reviewed the necessary paperwork to write her declaration but did not review the

23  entire file for her opinion to be stated." (*Id.*) Ms. Khan misunderstands Ms. Yurkovich's

24  testimony. Ms. Yurkovich did not testify that she had a role in Ms. Khan's loan modification

25  attempts. She merely testified that she has access to Bank of America's business records,

26  explained what those records say, and attached those records to her declaration. Federal Rule of

27  Evidence 803(6), which sets forth the business records exception to the hearsay rule, allows for

28  testimony about a business record by either the custodian of records or a qualified witness. Based

*United States District Court*
*Northern District of California*

on her testimony, the court finds that Ms. Yurkovich is such a person. The court overrules Ms.

Khan's objection to the Yurkovich Declaration. *See Saxon Mortg. Servs., Inc. v. Hillery*, No. C-

08-4357 EMC, 2009 WL 2435926, at *1 (N.D. Cal. Aug. 3, 2009) (overruling a similar objection

where the declarant "show[ed] that he has a sufficient understanding of Consumer Solutions'

record-keeping system").

Ms. Khan also objects to the admissibility of the documents attached to her deposition

testimony. (Opposition, ECF No. 160 at 15.) Mr. Whittemore attached to his declaration a "true

and correct copy of excerpts of" Ms. Khan's deposition, and those excerpts include exhibits that

were used during that deposition. (Whittemore Decl., ECF No. 152-3 ¶ 2 & Ex. A.) Mr.

Whittemore signed his declaration under penalty of perjury. (Whittemore Decl., ECF No. 152-3 at

2.)

Ms. Khan says that these documents "clearly do not have my signature and are not the true and

correct copies of the documentation [Bank of America] refers to in [its] motions/pleadings."

(Opposition, ECF No. 160 at 15.) Bank of America responds by pointing out that Ms. Khan

testified repeatedly during her deposition that those documents did in fact contain her signature,

and she authenticated them then. (Reply, ECF No. 161 at 9; *see* Whittemore Reply Decl., ECF No.

161-1 ¶ 7 & Ex. D.[4]) Ms. Khan's prior authentication undermines her objection. Bank of America

---

[4] Although Mr. Whittemore testified in the Whittemore Declaration and Whittemore Reply Declarations that the excerpts from Ms. Khan's deposition were "true and correct," that alone does is not sufficient to authenticate deposition excerpts. As the Ninth Circuit has explained:

A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action <u>and</u> includes the reporter's certification that the deposition is a true record of the testimony of the deponent. *See* Fed. R. Evid. 901(b); Fed. R. Civ. P. 56(e) & 30(f)(1);11 *Beyene*, 854 F.2d at 1182; *Pavone v. Citicorp Credit Servs., Inc.*, 60 F. Supp. 2d 1040, 1045 (S.D. Cal. 1997) (excluding a deposition for failure to submit a signed certification from the reporter). Ordinarily, this would have to be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted. It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a "true and correct copy." *See Beyene*, 854 F.2d at 1182. Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition. *See id.*; *Pavone*, 60 F. Supp. 2d at 1045.

*Orr*, 285 F.3d at 774 (emphasis added). The court pointed this out to Mr. Whittemore at the hearing, and he subsequently filed a declaration attaching the necessary reporter's certification.

United States District Court
Northern District of California

argues that the "sham affidavit rule"—which states that a court may disregard a "sham" affidavit that a party files to create an issue of fact by contradicting the party's prior deposition testimony—defeats Ms. Khan's objection. *See Kennedy v. Allied Mutual Ins., Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991); *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th Cir.1985); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543-44 (9th Cir. 1975). That rule, however, does not apply when sworn testimony is contradicted by unsworn evidence. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir.1999) ("This is different, however, from our sham affidavit cases, because plaintiff's] deposition testimony and sworn declaration in this case are consistent and are contradicted only by [his] unsworn letters."). This does not matter, though, because, as the court explained above, Ms. Khan's unsworn declaration that was not signed under penalty of perjury simply is not evidence the court can consider. She states that the signatures on the documents are not hers, but she offers no evidence to support this. The court overrules her objection.

### C.  Bank of America Is Entitled to Summary Judgment

With those matters settled, the court turns to the merits of Bank of America's motion. Its argument is simply that Ms. Khan has not produced evidence supporting any of the elements of her fraud claim. As the court explained before when ruling on Bank of America's motions to dismiss, "[a] cause of action for fraud [under California law] requires the plaintiff to prove (a) a knowingly false misrepresentation by the defendant, (b) made with the intent to deceive or to induce reliance by the plaintiff, (c) justifiable reliance by the plaintiff, and (d) resulting damages." *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192 (9th Cir. 2001) (quoting *Wilkins v. Nat'l Broadcasting Co., Inc.*, 71 Cal. App. 4th 1066, 1082 (1999)); *see also* Cal. Civ. Code § 1572.

To remind ourselves what Ms. Khan's fraud claim against Bank of America is all about, and to determine whether Ms. Khan has produced evidence showing genuine issues of material fact regarding the elements of that claim, it is helpful to look back to the allegations in the operative Third Amended Complaint. As the court recounted in its April 22, 2015 Order Granting Defendants' Motions to Dismiss Plaintiff's Third Amended Complaint, Ms. Khan alleged in her

(Supplemental Whittemore Declaration, ECF No. 162.)

14

general allegations as follows:

> Ms. Khan sought, and/or thought she received, trial or permanent loan modifications of the First Loan on three occasions from Bank of America. (*See* TAC ¶ 15.) On the first occasion, Ms. Khan alleges that she obtained a temporary loan modification in September 2009, made modified payments in October and November 2009, received a permanent loan modification contract in January 2010, and signed and returned the permanent loan modification contract and provided evidence of her income that same month, but Bank of America nevertheless cancelled the modification, stating that it never received proof of her income (a claim she denies). (*Id.* ¶ 15(A).) On the second occasion, Ms. Khan alleges that she obtained another loan modification in January 2010 and that she made modified payments in February and March 2010, but Bank of America cancelled the modification without giving any reason for its doing so. (*Id.* ¶ 15(B).) On the third occasion, Ms. Khan alleges that she obtained a loan modification in April 2010. (*Id.* ¶ 15(C).) She alleges that she was required to supply additional information, which she did, and that she believed the modification was in place until she received a Notice of Default from ReconTrust. (*Id.*)

(4/22/2015 Order, ECF No. 149 at 2-3.) And in the allegations specific to her fraud claim, she

alleged as follows:

> 35. In November 2009 [Ms. Khan] and Bank of America . . . entered into a US Government backed Home Affordable Modification Agreement. The agreement stated[,] "If (Plaintiffs) are in compliance with this Trial Period Plan . . . then the Servicer will provide a Home Affordable Modification Agreement." [Ms. Khan] provided all requested information and made 3 monthly payments of $2,118.78 as agreed in the modification plan. [Bank of America] never carried through with [its] commitment and never provided [her] with a Permanent Modification Agreement.
>
> 36. Bank of America made false statements when denying [Ms. Khan] a Mortgage Modification. Bank of America told [her] that [she was] denied a modification due to negative NPV or Net Present Value. Both of these statements contradicted. In a letter regarding [her] case with the US Comptroller of the Currency, Bank of America confirmed [it] had received updated financials. Additionally, in a letter dated July 19, 2011 Bank of America tried to show why [it] denied a mortgage modification based on Negative NPV. However[,] the letter was completely blank[,] indicating they had never even evaluated our NPV or Negative Present Value.
>
> 37. The representations of Bank of America were false and fraudulent as Bank of America caused a trustee's sale to be scheduled on February 9, 2012, without [Ms. Khan's] knowledge. Although [Ms. Khan] had numerous communications with Bank of America prior to December 15, 2009, Bank of America never disclosed to [her] that the [Michelle Street Property] would be sold at a trustee's sale on that date. Bank of America intentionally made the representations as part of [its] pattern and practice to deceive borrowers such as [she] into relying to their detriment so that [it] could foreclose on homes before borrowers could seek other remedies or options. The exact same thing happened to [Ms. Khan]. [Ms. Khan] justifiably relied on the oral and written representations of Bank of America and Bank of America's written Forbearance Agreement that no foreclosure would take place during the loan modification and forbearance process and did not seek other remedies or pursue other options. As a proximate result of Bank of America's fraudulent misrepresentations, [Ms. Khan] lost [her] home and [Bank of America]

inflicted great emotional distress and suffering on [her].

38. Accordingly, as a result of Bank of America's fraudulent conduct, [Ms. Khan] has suffered, and will continue to suffer, compensatory, general and special damages in an amount [to be proved at trial]. Additional, Bank of America acted with malice, fraud and/or oppression and, thus, [Ms. Khan] is entitled to an award of punitive damages.

(TAC, ECF No. 132 ¶¶ 35-38.)

Clearly, these allegations do not line up with the story that is supported by the evidence. As for Bank of America's alleged "misrepresentations," in her Third Amended Complaint, Ms. Khan alleged that she received a temporary loan modification under HAMP in November 2009, made the required trial payments, and received a permanent loan modification in January 2010, but Bank of America later cancelled the modification for no reason. The evidence does not support these allegations. There is no evidence showing that Ms. Khan received a temporary loan modification under HAMP in 2009. There is evidence that she received a permanent loan modification offer under Bank of America's Homeownership Retention Program in January 2009, but the evidence also shows that that modification offer—2009 Loan Modification Agreement—was subject to Bank of America's validation that Ms. Khan in fact qualified under the Program. The evidence also shows that Bank of America subsequently tried to validate Ms. Khan's income (and thus her eligibility) during February and March 2010. A Bank of America employee called Ms. Khan several times during these months. Ms. Khan also talked to a different Bank of America employee when she tried to make her payment on March 31, 2015, and she was told that she needed to provide documents to verify her income. There is no evidence to suggest that Ms. Khan did this within the deadline for doing so. The evidence does suggest, however, that Bank of America cancelled the 2009 Loan Modification Agreement as a result.

Ms. Khan also alleged that she obtained a loan modification in April 2010, but the evidence does not support this allegation, either. There is no evidence of a new loan modification agreement. There is evidence that Ms. Khan signed the 2009 Loan Modification Agreement again on May 20, 2010 and sent it to Bank of America, but there is no evidence that her doing so meant that she "obtained" a loan modification. The agreement that she signed and sent in, after all, is the one that lapsed in January 2010.

1     Ms. Khan also alleged that Bank of America told her that she was denied a modification due to

2 negative NPV but there is no evidence to support this allegation. To the contrary, the evidence

3 shows only that Bank of America cancelled the 2009 Loan Modification Agreement because Bank

4 of America could not verify Ms. Khan's income.

5     Finally, Ms. Khan also alleged that Bank of America never disclosed to her that the Michelle

6 Street Property would be sold at a trustee's sale, but the evidence shows that a trustee's sale has

7 never taken place.

8     At the hearing, Ms. Khan focused almost exclusively on her contention that SPS, which has

9 become the servicer of her loan within the last year or so, has not honored the permanent loan

10 modification that she received from Bank of America in May 2013. Although Bank of America

11 submitted evidence in support of its argument that Ms. Khan is not correct, this is not at issue in

12 this action. (*See* Syphus Decl., ECF No. 161-2.) This action is about Bank of America's conduct

13 surrounding Ms. Khan's attempts to get a loan modification in 2009, not about SPS's actions that

14 have taken place years after this action was instituted.

15     In short, none of the "misrepresentations" that Ms. Khan alleged that Bank of America made

16 are supported by the evidence. Thus, there is no admissible evidence in the record that shows there

17 is a genuine issue of material fact regarding the first element of Ms. Khan's fraud claim.

18     There also is no admissible evidence in the record that shows there is a genuine issue of

19 material fact regarding the second element of Ms. Khan's fraud claim, that is, that Bank of

20 America knowingly made misrepresentations with the intent to deceive her or to induce her

21 reliance on those misrepresentations. First of all, the court just determined there is no evidence to

22 suggest that Bank of America made any misrepresentations. Secondly, even if the denial of the

23 2009 Loan Modification Agreement can be said to be the result of a misrepresentation, there is no

24 evidence to suggest that Bank of America intended to deceive Ms. Khan or to induce her to rely on

25 anything. Ms. Khan alleges that Bank of America intentionally deceived her so it could foreclose

26 on the Michelle Street Property before she could seek other remedies or options, but there is no

27 evidence to support this allegation, and in fact the Michelle Street Property was never sold at a

28 trustee's sale. There is evidence that a Bank of America employee told Ms. Khan that the Michelle

1   Street Property might qualify for a modification under HAMP if she moved into the Michelle

2   Street Property, but this allegation does not support a conclusion that Bank of America intended to

3   defraud Ms. Khan.

4       As for the third element, Ms. Khan alleges that she justifiably relied on Bank of America's

5   misrepresentations that no foreclosure would take place during the loan modification process and

6   she did not seek other remedies or pursue other options, but, again, the Michelle Street Property

7   was never sold at a trustee's sale and she ultimately received a loan modification from Bank of

8   America. There is no admissible evidence in the record that shows there is a genuine issue of

9   material fact regarding this element.

10      In conclusion, there court believes that there is ample evidence in the record to support Bank

11  of America's argument that Ms. Khan cannot show a genuine issue of material fact regarding

12  many elements of her fraud claim.[5] Most crucially, there is no evidence to substantiate Ms. Khan's

13  allegations that Bank of America made any misrepresentations to her. While she may contend that

14  she did send Bank of America all of the documents it told her it needed to verify her income, there

15  simply is not evidence in the record to support this contention. All of the evidence in the record

16  suggests otherwise.

**CONCLUSION**

18      For the reasons stated above, the court grants Bank of America's motion for summary

19  judgment.

20      **IT IS SO ORDERED.**

21  Dated: June 25, 2015

23  _____
    LAUREL BEELER
    United States Magistrate Judge

_____

[5] Bank of America also argues that Ms. Khan cannot show that she was damaged by its
cancellation of the 2009 Loan Modification Agreement because ultimately accepted a loan
modification in 2013 that contained better terms that the 2009 Loan Modification Agreement.
(Motion, ECF No. 152 at 22-23.) Even if this is true, the court is not convinced that Ms. Khan
could not have suffered damages. In any case, this is a moot point because Ms. Khan's fraud claim
fails for more fundamental reasons, as explained above.

ORDER (No. 3:12-cv-01107-LB)

United States District Court
Northern District of California